STATE EX REL. BASHFORD VS. FREAR, Secretary of State.

*February 23—March 9, 1909.*

*Supreme court: Justices: Term of office: Appointment to fill vacancy: Change in compensation: Constitutional law: Practical construction.*

1. Art. VII of the constitution creates the office of justice of the supreme court, fixes the term of office, and provides for filling the same, and such term is a unit, including, so far as such article is concerned, periods within the full term of incumbency by appointment or election to fill a vacancy.

2. Generally speaking, a constitutional prohibition as to increase or decrease of the salary incident of an office during a term thereof, whether in the form of a prohibition of such a change during the term for which an officer is elected or during an officer's term of office, refers to the full term, fixed by the fundamental or other law.

3. In the situation last mentioned, generally speaking, a person appointed to a vacancy or elected thereto, does not have a term of office, in the constitutional sense, but takes a part of the unit, to wit, of the full term. He merely steps into the place and term of his predecessor and becomes subject to the incident of that term, the salary.

4. Whether "his term of office" in sec. 26, art. IV, of the constitution of the state of Wisconsin is synonymous with his incumbency of the office under a particular election or appointment, or is synonymous with the full term of the office created by art. VII, is not so free from doubt as not to be open to solution by judicial construction.

5. The language "his term of office" in the constitutional provision creating legislative disability to change the compensation of public officers under some circumstances, is ambiguous.

State ex rel. Bashford v. Frear, 138 Wis. 536.

6. The language may, as an original proposition, be regarded as treating with the term of office created by art. VII or any particular incumbency, whether of a full term or part of a term.

7. In case of an ambiguous law being executed by administrative officers as having a particular meaning which is reasonable, such practical construction is entitled to more or less weight, according to circumstances, in determining the intent of the awmakers.

8. In case of such practical construction obtaining uninterruptedly for a very long period, particularly so long as fifty years, it is entitled to controlling weight in determining the intent of the awmakers.

[Syllabus by MARSHALL, J.]

TIMLIN, J., concurring, is of the opinion that sec. 26, art. IV, Const., relates to the *officer*, not to the *office*, and to *his* term, not to *the* term; and that the true interpretation of the section is that he who comes into an office lawfully by election or appointment to fill a vacancy caused by the death, disability, resignation, or removal of a different prior incumbent is not under the restrictions as to increase or diminution of salary which bound the prior incumbent, but takes under the law in force at the time of his appointment or election to fill the vacancy.

APPLICATION for a writ of *mandamus* to compel the secretary of state to issue his warrant to the state treasurer in favor of the relator, Hon. *R. M. Bashford*, for $500 as balance of his salary as justice of the supreme court for the period from January 1, 1908, to July 1, 1908. *Granted.*

Hon. JOHN B. CASSODAY, pursuant to election and qualification, entered upon a full term of ten years as justice of this court on the first Monday of January, 1900. The salary fixed by law for a justice of such court was $5,000 per year, payable quarterly in advance. The office became vacant by his death, prior to January 4, 1908. In the meantime the salary was increased to $6,000, payable as before. On such date Hon. *R. M. Bashford* was duly appointed to fill the office made vacant as aforesaid, such appointment pursuant to sec. 9, art. VII, of the state constitution, to continue until the election and qualification of a successor of the deceased jus-

tice.   A successor so elected and qualified duly assumed the
duties of the office July 1, 1908.   In the meantime the sec-
retary of state issued warrants to said *Bashford* aggregating
$2,500, being the amount the deceased justice would have
been entitled to had he lived and continued his incumbency,
refusing to issue warrants to said *Bashford* for a half year's
salary at the rate of $6,000 per year, which he claimed was
his due.   He accepted the warrants without prejudice to his
right to the additional $500.   The secretary refused to rec-
ognize such claim upon the ground that the prohibition con-
tained in sec. 26, art. IV, of the state constitution as regards
any increase of a state officer's salary "during his term of of-
fice" relates to the full term created by the constitution, or
other written law, and not the particular part thereof during
which it may be filled by an incumbent, but covers all parts
as a unit, and that sec. 1, ch. 414, Laws of 1901, whereby the
salary incident was changed to $6,000 with a provision that
it should not apply to the remainder of the terms of justices
then in office, had reference to the regular terms of office, not
to particular persons filling the offices for particular periods.

Upon a motion by the defendant to quash the alternative
writ there was a brief for the petitioner signed by *John A.
Aylward* and *R. M. Bashford in pro. per.,* and briefs for the
defendant by the *Attorney General* and *Russell Jackson,* dep-
uty attorney general.

MARSHALL, J.   This application presents a very interest-
ing and somewhat grave question.   In all, or most, written
constitutions, provision is made against changing an officer's
salary during his term of office.

The temptation, which competency of the legislature to
change salaries of officers during terms of office would hold
out for it to do so, for bad as well as for worthy purposes, and
for executives to manipulate such a situation to serve either
purpose, or to favor one officer above another, or officers to

9]            JANUARY TERM, 1909.            539·

State ex rel. Bashford v. Frear, 138 Wis. 536.

scheme for their own pecuniary aggrandizement,—has been supposed to be so fraught with danger, interfering with that high standard of official life requisite to the best public serv-ice, that in the fundamental laws, generally, absolute disabil-ity of the lawmaking power to change the status of the salary of an officer after the commencement of the term for which he was elected, as it is sometimes phrased, or during his term of office, as it is likewise phrased, is found.

The general trend of authority is this way.  The constitu-tion or other written law creates the office and fixes the term thereof and gives thereto the incident of a specific salary. The office, the term, and the incident may exist for any period of time without the office being filled or without there being any method provided for filling it.  Upon such method being provided and the office being filled the incumbent takes it with its fixed term and incident.  If he goes out during such term and another steps in the latter does not take a new term but takes a part of the same term prior thereto enjoyed by his predecessor.  The term continues during its fixed period with its incident for such period regardless of how many in-cumbents there may be, each succeeding the other.  Where another incumbent goes in at the commencement of the full term prescribed by law, such full term becomes his term, within the meaning of language in the fundamental law pro-hibiting any change in an officer's salary during his term of office, and in case of his going out during such term and be-ing succeeded by another such other succeeds to the same term as that held by his predecessor, so that, during his incum-bency, the full term, so far as not yet run, becomes his term in the constitutional sense.

That has been supposed by courts which have dealt with the matter to be the proper construction to be placed upon a constitutional provision similar to ours, in view of the logic of the situation, regardless of whether the language of the constitution prohibits a change of salary of an officer "dur-

ing his term of office" (*Larew v. Newman,* 81 Cal. 588, 23 Pac. 227; *Storke v. Goux,* 129 Cal. 526, 62 Pac. 68); or "during the term for which he was elected" (*Harrison v. Colgan,* 148 Cal. 69, 82 Pac. 674); or "the time for which he was elected" (*Gaines v. Horrigan,* 4 Lea (72 Tenn.) 608).

Those decisions cited by counsel, as well as *People ex rel. Bentley v. Le Fevre,* 21 Colo. 218, 229, 40 Pac. 882; *Simpson v. Willard,* 14 S. C. 191; *Jameson v. Hudson,* 82 Va. 279; *State ex rel. v. Schmidt,* 14 Mo. App. 589, being all the cases of moment on either side, except one hereafter noticed, are to the effect that the term of office fixed by law, in the absence of some clear indication to the contrary, is a unit; that the incident thereto is as unvariable as the term, and that one who comes in to fill a vacancy does not take a new term but merely takes up the work of the old term with its duties and its incidents. The industry of counsel has resulted in placing before us all the authorities extant, bearing helpfully on the question. None of them go back within many years of the time when the administrative officers of this state, without judicial guidance, took a stand in regard to the matter.

The petitioner cites *Barnum v. Gilman,* 27 Minn. 466, 8 N. W. 375, as holding contrary to the foregoing, and that the words "term of office for which he is elected" in the Minnesota constitutional prohibition against a senator or representative holding any office under the authority of the United States or the state, with certain exceptions, "during the term for which he was elected," mean during the term of his incumbency; that the term for which he was elected is synonymous with "his term of office," which means during his incumbency of the office; that during one full term of office there may be several successive incumbents, each having a fraction of a full term, and in that situation have a term of office which as to him is his term of office.

That logic is diametrically opposed to the other cases cited and would go far to sustain the petitioner's petition, if the

court which adopted it had adhered to its decision. It had the support of a long line of opinions of the state's highest legal adviser, but when the court came to face the situation created by such decision, reinforced by such legal opinions, fifteen years later, it overruled it, adopting, without qualification, the same logic and arriving at the same conclusion as courts had before and have since, to which we have referred.

In view of the result reached, it is useless to spend further time in the discussion of authorities. So much as has been said seemed to be required to show that the authorities, upon which the learned attorney general and the petitioner rely, have not been overlooked or misunderstood. It seemed to be especially due to the attorney general and the secretary of state, as a vindication from any suspicion of capricious obstruction of the petitioner's efforts to obtain from the state treasury what he conscientiously believed to be his due.

In view of the trend of authority as we have fairly, it is thought, indicated it to be, they may well have had very serious doubts as to whether the petitioner's claim was valid, and, having such doubts, they exhibited a most commendable fidelity to their high official duty to guard the public funds by resolving that doubt in favor of the state and leaving the result to be dealt with by this court. If the result shall be that such doubt, under all the circumstances, in the judgment of this court, should be resolved in favor of the petitioner, it will not take even a jot from their credit in the matter.

Our constitution at sec. 1 [4], art. VII, creates the office of justice of the supreme court and the term of office. It left the legislature, as the instrumentality to attach thereto the salary incident, entirely untrammeled, except by sec. 10, art. VII, commanding that each of the incumbents "shall receive a salary, payable quarterly, of not less than one thousand five hundred dollars annually," and no other compensation whatever. The same section deals with the term of office created by the previous section referred to by providing that an incum-

bent "shall hold no office of public trust, except a judicial office, during the term for which he is elected" and all votes cast for him by the people or the legislature during such period except as aforesaid "shall be void." Here we have the office, the term of office, the incident of office, to wit, the salary and the exclusion from every field of official life outside of the judicial field during such term, to wit, the elective term. All that, is in the article especially devoted to the judiciary.

Turning now to art. IV, devoted to the legislature and its powers, we find that it creates an absolute disability of the lawmaking body to change, in any way, either by increasing or decreasing, any public officer's compensation "during his term of office." There is no prohibition in those parts of the constitution dealing with the different classes of state officials or their terms of office on the subject of increase or decrease of compensation, as in the other states to which we have referred. For instance, in California the prohibition, as to municipal officers, is in that part of the constitution relating to the offices. The same is true with reference to county officers and likewise with reference to judges of the courts and so with reference to offices commonly denominated state offices: governor, secretary of state, state treasurer, and the like. There is nothing on the subject in the chapter relating to legislative powers. The same is true in Tennessee.

We mention the last foregoing for what it is worth. It is not entirely without significance on the subject of whether the words, "his term of office," in the clause relating to legislative powers, means term of office created, as indicated in the article on the judiciary, or "during the term for which they are respectively elected," in sec. 10 of the same article. If the section which relates to the salary contained a prohibition as to increase or decrease, as in other state constitutions, there would be less difficulty in reaching a conclusion. As it is, the question presented is somewhat new. Its solution rests on the limitation of legislative power, disassociated entirely from

the provision as to the office, term of office, and salary where the term doubtless is disassociated from the incumbent.

Sec. 9 of art. VII, relating to filling vacancies in the office of justice of this court, is closely associated with the other features of art. VII and doubtless speaks of term of office in the same sense as such features. It provides that in case of vacancy it shall be filled by appointment by the governor, which shall continue until a successor is elected and qualified, and such successor shall hold his office the residue of the unexpired term, thus recognizing the unity of the term, part lasting during the incumbency of the person taking the office by election at the start, part during the incumbency of the appointee, and part, "the residue of the unexpired term," during the incumbency of the second person elected.

It seems quite singular, if the plan of the constitution makers were to apply the idea of unity to the salary, coinciding with unity of term under art. VII, that a prohibition as to change in the salary incident to the office being made during a pending term, was not incorporated in sec. 10, the appropriate place as an original matter and according to constitutions generally then existing and constitutions since framed for other states. The constitution of Michigan was used as one of the models worthy to be followed. The particular feature under discussion was incorporated therein at the point where one would expect to find it, if the salary for the full term was intended to correspond thereto as to unity. Why was it dropped out by the framers of our constitution, they contenting themselves with placing a limitation upon legislative power, in the article on that subject, to change the "compensation of any public officer during his term of office," using language, as will be seen, quite appropriate to the idea that the particular time of the particular officer's incumbency of the office should be regarded, at that point, as "his term of office" instead of the full term dealt with from first to last in art. VII?

Now at this late day, for the first time, the court is challenged for a judicial answer to the question of whether the peculiarity above mentioned, efficiently, evinces a purpose to deal with a mere period of incumbency in art. IV while plainly dealing with the office, and term of office, as a unity, disassociated from the personal element, in art. VII. It is somewhat unfortunate that it has been so left; that after the lapse of more than half a century, during which many of the honored members of this court were compensated for their services upon the theory that the term mentioned in art. VII is not, necessarily, that mentioned in art. IV, and in excess of what they would otherwise have received, and after most of the justices, so affected, are only with us in memory, in history and the records,—we must take up the question of whether they were rightly so compensated or not. We approach the question, notwithstanding such situation, entirely unconscious of bias, one way or the other, hoping to decide the same upon the high plane of judicial impartiality.

If we had to deal with the matter from the standpoint of 1857, or thereabouts, we might not be able to discover, satisfactorily, that a prohibition, such as is found in other constitutions, associated with the creation of the office and of the term of office and providing for its incident of salary, bore primarily on the competency of the officer to take an increased salary, more clearly than on the competency of the lawmaking power to provide for it; or that, whether the prohibition be so located or as we find it in art. IV of our constitution, it would not be a limitation of legislative power, primarily.

If it were not for the conditions hereafter noted it would be very difficult to escape from the logic of the decisions elsewhere to which we have referred. Except for the peculiarity mentioned the situations harmonize in opposition to the petition.

From what has been said, it is quite clear that the meaning

State ex rel. Bashford v. Frear, 138 Wis. 536.

of "his term of office" in art. IV of the constitution is far
from being free from ambiguity. Even if it were used in an
appropriate section in art. VII, dealing with the office of jus-
tice of this court, the term of office, and the compensation, it
would still be, as an original matter, far from being free from
obscurity. That is well illustrated by the decisions of the dif-
ferent courts which have defined it, only by resort to rules
for judicial construction. It will be seen by an examination
of the decisions to which we have specially referred that in
every one of them the term under discussion, or some similar
term, was treated as involving obscurity of meaning. So far
as the uncertainty in the present case exists, by reason of the
location of the vital words in art. IV instead of in art. VII,
obscurity is lessened in favor of the petitioner. If one could
entirely shut his eyes to the features of art. VII to which we
have alluded, the words "compensation of any public officer
during his term of office" might be held to unambiguously re-
fer to the period of incumbency as the term of office of the
incumbent. If there was a shadow of ambiguity, it might be
dispelled by the light of the conditions the constitution makers
were dealing with. There was a young but rapidly growing
community. Offices, and terms of office of considerable
length, had been provided for, or were in contemplation, with
salary incidents so very meager that it could not have been
thought, in some cases, the grade of service appropriate to the
situations could be secured beyond a brief pioneer period.
That is strikingly illustrated by the fact that the salary of a
justice of this court was, at first, only $1,500, while the term
of office was fixed at six years.

When it is conceded, as it must be, on the most favorable
view for respondent, that the situation involves uncertainty, it
admits that practical construction, so far as the same has been
given to the matter, is entitled to considerable weight, espe-
cially since it has covered a period of over fifty years without
interruption, as we shall see. So we will review the situation

in that regard, not stopping to discuss the competency of practical construction of a law, in aid of discovering the intent thereof, where such intent is involved in obscurity. The law in that regard is elementary.

By ch. 102, Laws of 1857, the salary of a justice of this court or a circuit judge was increased from $1,500 to $2,500, payable quarterly, in the manner then payable, the same to apply to any justice thereafter elected or appointed, but not to be construed so as to increase the compensation of any circuit judge then in office "during his term of office." It will be interesting to note that the only subject mentioned in the title of the act is, salaries of the judges of the circuit courts, and that the declaration against construction so as to enhance the compensation of officers in service during their terms did not apply to justices of the supreme court. That suggests legislative intention, so far as competency existed, to increase the compensatory incidents of such offices as to incumbents coming in after the passage of the act by appointment or election to fill out a pending term under art. VII of the constitution. That is, that the legislature had in mind the idea that the term of office in such article was something different from the term of office of any public officer under sec. 26, art. IV. Without such idea no reason could well be assigned for the legislative purpose indicated.

Under the law aforesaid, till the decision in *State ex rel. Crawford v. Hastings,* 10 Wis. 525, made in the early part of 1860, there was some uncertainty, after the passage of ch. 41, Laws of 1854, seemingly, changing the time for the commencement of the term of office of a justice of this court from June 1st after the election till the first Monday of January after such election, as regards whether such change was effected or not. Justice Cole and Chief Justice Dixon at the outset concluded that such change was effected, while later the chief justice joined with Justice Paine in a contrary decision. During the period of uncertainty Chief Justice

WHITON was re-elected, and evidently supposed that the term for which he was first elected, which by the law then in force continued till May 31, 1857, or until his successor was elected and qualified, covered the interim between that date and the commencement of the new term under the change in the statutes, but that such interim period might be a new term under sec. 26, art. IV, instead of a part of the whole term. If "term" under art. VII of the constitution was identical with "term" mentioned in art. IV, then the salary incident might be governed by the law prior to the passage of the act of 1857. If the appointment was for a new term intervening between the termination of the old and the commencement of the new one; if the interim was to be considered as a period to which he was appointed by force of law, then it might be that the increased compensation provided by the act of 1857 applied to it, and it might be that such situation was the very thing the legislature had in mind in the peculiarity of the legislation before mentioned. Let that be as it may, as the record shows, the chief justice took advice of his associates in service, Justices COLE and SMITH. All concurring, they advised, unofficially, the secretary of state. Thereupon, and perhaps, as is most probable, upon advice of the attorney general, he ruled that while the interim period was, in one sense, a part of a term added, by force of law, it was a separate period or term of office as regards sec. 26, art. IV, which the legislature probably had in contemplation, and accordingly a warrant was issued to him for the increased pay provided by the act of 1857.

Later Justice PAINE was elected to succeed Justice SMITH, whose term of office, according to the law as it existed at the time of his election, expired May 31, 1859, while the new election was for a term commencing, as was supposed by some, January 1, 1860, and by others as not so commencing, Justice PAINE being of the latter view. With that uncertainty existing it was solved by Justice SMITH resigning and Justice

PAINE being appointed to the place to serve until the succeed-
ing January 1st by such appointment, and its being so ar-
ranged that he would fit into the place regardless of the out-
come of the mooted question.  For this appointive period the
secretary of state, as state auditing officer, ruled that the sal-
ary incident was regulated by the act of 1857, and issued to
Justice PAINE salary warrants for the period commencing
June 1, 1859, and ending January 1, 1860, so as to comply
with the law whether such period were considered a term of
office within the meaning of sec. 26 aforesaid, or part of a full
term commencing June 1st aforesaid under art. VII of the
constitution.

By ch. 33, Laws of 1867, the salary incident to the office of
justice of this court was again changed from $2,500 to $3,500
and to apply to justices "hereafter elected or appointed."
The act took effect March 26, 1867.  Public desire to retain
the valuable services of Chief Justice DIXON, whose term was
drawing to a close, doubtless influenced this legislation.  The
history of the times so tells us.  The election was to come,
regularly, in April, 1869, leaving quite a period with the sal-
ary incident at the low point.  It was supposed by the gov-
ernor, the chief justice, and, evidently, his associates, Justices
COLE and PAINE, that in case of his resignation and reap-
pointment to fill out the pending term as an appointee, he
would have a new incumbency under sec. 26, art. IV, afore-
said and be within the letter of the salary increase act.  Such,
as we have seen, had been the prevailing idea for now over
ten years.  That course was taken for the manifest pur-
pose—which all parties concerned, directly or indirectly, the
governor, the attorney general, all the justices of this court
as individuals, the state treasurer, and the secretary of state,
who necessarily ruled on the question in issuing the warrant
which the chief justice received—of affording him the salary
increase designed, which was supposed to be necessary in or-
der to retain his services, and which was universally thought
he might rightfully receive.

State ex rel. Bashford v. Frear, 138 Wis. 536.                __

After the increase of salary by the law of 1867, Justice DOWNER, who succeeded Justice PAINE upon his retirement in 1864 to enter the army, resigned and was succeeded, September 11, 1867, by return of Justice PAINE, by gubernatorial appointment, to fill the place till it could be filled by election the succeeding spring. In due time it was so filled by election of Justice PAINE. In the meantime, by ch. 145, Laws of 1868, the salary was changed from $3,500 to $4,000, to apply, as before, to justices thereafter elected or appointed. In January, 1871, Justice PAINE died and Judge WILLIAM P. LYON, by appointment, succeeded to fill the vacancy till it could be provided for by election the succeeding spring, which was done, Justice LYON being elected, and at the same time being chosen for a full term. Here then we have four separate periods of incumbency during the term for which Justice DOWNER was elected and as to which period, respecting his term of office under art. VII aforesaid, the salary incident was $2,500 per year. For two of the periods the office was filled by Justice PAINE, as we have seen, one by appointment and one by election, while the other two were filled by Justice LYON. Each incumbency was regarded, as to the incumbent, as his term of office under sec. 26 aforesaid, Justice PAINE receiving the increase of salary over that received by Justice DOWNER of $1,000 for the first period and $1,500 for the second period, and Justice LYON the latter increase for each of his periods. Justice PAINE's first period, as will be observed, preceded the transaction as to Chief Justice DIXON before mentioned, and was regarded as a safe precedent therefor, in view of previous history, as will be hereafter seen. Justice PAINE's second period and Justice LYON's two followed the agitation created by the transaction as to the chief justice and was doubtless supposed to be justified, without room for serious controversy, by the result of such agitation.

We may well say, in passing, that in the official record as promulgated by the secretary of state, from time to time, in the blue book, both as to all the periods we have mentioned

and that of RYAN, Chief Justice, hereafter alluded to, the salaries of justices of the supreme court are specified, in harmony with the construction of the fundamental law, by those who had to do with the matter, as indicated.

The action of Chief Justice DIXON challenged public attention, sharply, to the manner the constitutional provisions under discussion had been construed and administered. Some claimed they had been violated. Such is the history of the times. The next spring after the particular occurrence it was necessary to fill the place temporarily occupied by the appointee, by an election. Chief Justice DIXON was a candidate for the vacancy he had created. Hon. Charles Dunn was an opposing candidate, the issue largely, if not in the main, being whether the occurrence aforesaid was proper.

In the situation stated, the position of the chief justice and his associates and all others who had been previously concerned in administering the ambiguous law, was placed before the people of the state in a carefully prepared article, published in the official state paper under date of January 16, 1868. By whose hand it was prepared we have no way of knowing, except as we may judge by the manner the subject was treated. That the article was written with consummate care and the situation stated with the legal precision which would be expected of a trained judicial mind, is quite evident. That it, at least, received the approval of the chief justice and his associates, there can be little or no doubt. Here is so much of the presentation as is particularly appropriate to the full history we are endeavoring to write, and appropriate as a vindication of the chief justice from any criticism upon his course from the standpoint of common judgment in 1868:

"The provision of the constitution which is claimed to have been violated, is found in art. IV, sec. 26, and is as follows: 'Nor shall the compensation of any public officer be increased or diminished during his term of office.' What was the meaning and intention of this provision? Did it have reference to

the full term of office only? This is not claimed by any one. Thus it is conceded that Judge PAINE, who was appointed in the place of Judge DOWNER, who had resigned, is entitled to the increased salary. This is for the reason that his 'term of office' did not commence until his appointment took effect. It was, therefore, a distinct, independent term of office and not identical with the term of Judge DOWNER, who had resigned.

"The term of office which Judge PAINE holds by appointment will continue until his successor is elected and qualified. And then his successor will enter upon another term of office, which will be his term. And if, before such election, the salary should be again changed, and either increased or diminished, no one will doubt that such successor should be paid according to the new law, whether more or less than the present salary.

"This is because there will be three distinct terms of office, all occurring within the full term, or period of time for which Judge DOWNER was elected. First, his term, which expired when his resignation took effect. Second, the term of Judge PAINE, which began at his appointment and will end when his successor is elected and qualified. And third, the term of his successor, who is to be elected next spring.

"Now it being conceded, as it is universally, that these constitute three distinct terms of office, within the meaning of the constitutional provision under consideration, all ground of objection to the action of Judge DIXON fails. Because the constitution did not prohibit an increase or diminution of the salary at any time during the full term for which he was elected. On the contrary, it only prohibited it as to him during the term for which he should hold by virtue of that election. But it was in his power to put an end to that term at any time. And who can say that he had not a perfect right to do so? He violated neither the letter nor the spirit of the constitution in giving up his office. He submitted himself again to the appointing power, and will be obliged to submit himself again to the people if he is re-elected. The governor was not obliged to reappoint him. If there had been any valid objection against it—any fitter person to fill the office—the governor might have appointed any other citizen as well, and we are bound to suppose that, in this case, as in any other, he made the appointment because he considered it the best, and in view of the responsibility that rested upon him. But as he

did reappoint him, Judge Dixon took the office by a new ten-
ure and entered upon a new term, precisely as any other per-
son would have done. It was, therefore, with him a mere ques-
tion of financial expediency—it might be said, with truth, of
financial necessity. It was a question of whether he would
continue to hold the office by virtue of his election, at the old
salary, or give it up and take his chance for a reappointment
and re-election for the sake of getting the increased salary.
The reasons which compelled and fully justified his course are
notorious. The war had doubled the expense of living, so that
the old salary was inadequate to the support of his family.
He had spent a number of the best years of his life in hard,
unremitting toil, for this inadequate compensation, and hav-
ing exhausted the little surplus which he had previously ac-
quired it was a matter of sheer necessity with him either to
give up the office altogether, or to take it by a new tenure un-
der which he would receive the increased pay. Of his right to
do this there is no question. That it was, under the circum-
stances, a duty which he owed to himself and his family, is
clear. Of course the people are not obliged to re-elect him.
That was one of the chances which he took, and had a right
to take. But to refuse to re-elect him upon this ground would
furnish a signal illustration of that affected virtue which
strains at a gnat but can swallow a camel."

Thus the matter was put to the people, followed by such
discussions, as would naturally be expected, up to the day of
election, resulting in election of the chief justice by a substan-
tial majority. That set the matter at rest for a long time,
and, as was supposed, probably, permanently, as indicated by
the fact that the chief justice was re-elected the following
spring for a full term of six years without opposition and as
further indicated by subsequent history, as we shall see. To
what extent the foregoing really vindicates, as right, the cir-
cumstance of the resignation from office and regaining thereof,
in the manner indicated, for the manifest purpose of thereby
obtaining a greater compensation for official services than that
incident to the office at the start, we do not intend to express
any opinion.

By ch. 293, Laws of 1873, the salary was raised to $5,000,. payable, as before, to justices "hereafter elected or appointed." January 1, 1874, Chief Justice Dixon, whose term was to expire by law the 31st day of May, 1875, resigned, leaving a residue of the term for which he was elected of some over one year. Hon. Edward G. Ryan took the place, by appointment, till elected in the spring of 1875 to fill out the residue of the term. Such election and appointment were, in harmony with previous history and within the letter and intent of the act of 1873, for an incumbency, first by appointment and, subsequently, by election: two separate terms of office, within the meaning of sec. 26, art. IV, of the constitution, as the same had been theretofore understood, though parts of one entire term, contemplated by art. VII. Accordingly Chief Justice Ryan was compensated for his services according to the act of 1873, instead of according to the law at the time of the commencement of the term he was elected to fill out.

Later upon the occasion for issuance of a warrant to Justice Siebecker for the first quarter year of his incumbency by appointment to fill the vacancy caused by the death of Justice Bardeen, opportunity was again presented to the state auditor to pass upon the matter under discussion, the salary incident of the office having been changed during the term for which Justice Bardeen was elected, to $6,000. It appears. such auditor was uncertain as to whether the appointee was entitled to the increase or not, because, whereas, on the former occasion, the act expressly provided the increase should be so awarded, the new act (ch. 138, Laws of 1901) afforded the increase only "to justices thereafter chosen and for terms of office thereafter to commence," expressly excluding those in office as to the remainder of their terms, that being amended by ch. 414, striking out the reference to those thereafter chosen. Thus the question was presented of whether an incumbency by appointment constituted a period denominable

as "a term of office" within the meaning of the act, as it had
been treated theretofore for some forty years under sec. 26 of
the constitution aforesaid. The omission of the words "here-
after appointed or elected," found in all previous acts, ob-
viously challenged special attention. The attorney general,
being applied to for advice in the matter, gave his opinion to
the auditing officer under date of May 13, 1903 (see Biennial
Report and Opinions, 1904), to the effect that the term of
office mentioned in the act was the constitutional term of ten
years of which the appointive term formed a part, and, there-
fore, that the latter was expressly excluded from effect by the
salary increase, and further that any legislative attempt to
change the salary incident of the constitutional term of ten
years, so as to make it applicable to increase the compensation
to an incumbent serving a part of said term by appointment,
over the compensation incident to the office at the commence-
ment of such term, would be unconstitutional. Whether the
learned attorney general was familiar with the history we
have given, does not appear. We may well presume, from the
fact that no reference is made to it in his opinion, that he was
not. If so, we may well conclude that, in the light of such
history, a different opinion might have been given.

Relying on that opinion, the auditing officer ruled against
Justice SIEBECKER's application. Later, as appears, and
whether by further advice of the attorney general's office does
not appear—but the presumption would be that new light had
been shed on the matter which cast grave doubts upon the cor-
rectness of the opinion in the mind of the law officer,—the
auditing officer reversed his ruling and issued to Justice SIE-
BECKER a warrant for the increased salary, which had for a
considerable length of time been retained.

It does not seem that the change in ch. 138, Laws of 1901,
by ch. 414, had any significance, except to cut off opportunity
to resign and regain the place by appointment, as Chief Jus-
tice DIXON did, and thereby a person in service at the time of

the passage of the act obtain the benefit thereof. That is suggested by the two elements, "justices hereafter to be chosen" and "for terms hereafter to commence," in conjunction. The words "term of office," as regards changes in salary, had by long usage and many rulings, as we have seen, come to mean, under sec. 26, art. IV, of the constitution, the period of incumbency whether for a full term or a fraction thereof. It is fair to presume that it was used by the legislature in such sense, no other having obtained here during the life of our constitution. That such was the case, is persuasively shown by the fact that, following the restriction of the act to "terms of office thereafter to commence," the act, *ex industria,* provided that justices . . . "now in office shall be paid during the remainder of their terms" the same salaries as theretofore, thus unnecessarily giving significance to the personal element, except to emphasize the idea that the term previously spoken of was the term of incumbency. That construction harmonizes with the whole history of the subject from the formation of the constitution, and is certainly reasonable, if not inevitable, if we concede that "his term of office," as used in sec. 26, art. IV, has reference to the personal element, primarily, instead of to the "term," primarily, being disassociated from such personal element, as in art. VII.

It is the opinion of the court that the view which has so long prevailed, which commenced, so far as discovered, with Chief Justice WHITON, one of the dominating personalities framing the constitution, seconded by Justice COLE, also one of such framers, and has been the guide for many legislatures, justices of this court, and all state officers having to do with the matter, without any disturbance whatever till a question was raised, as we have indicated, under the peculiar wording of the law of 1901, should continue to be the guide; that such construction of sec. 26, art. IV, is permissible, if not plainly required, and that after so long and so harmonious submission to such construction, it should be regarded as the correct one.

As we have progressed in an endeavor to voice, logically, the court's opinion, reluctance, at first, to yield thereto lessened as the pages of history unfolded and now is entirely displaced. As an original matter, it is not improbable that the term of office spoken of in art. VII is the term of office spoken of in art. IV, and that it is a unit as regards the salary incident, though we must freely confess ambiguity in the situation and reasonableness of the other view, which we conclude, in face of the uniform past, on principle, ought to be followed. For years after the constitution was adopted there were no aids in the books to its construction in respect to the question under discussion. If those who had early to do with the matter had had the benefit of the judicial reasoning on like provisions, which was postponed for some twenty years, a different conclusion might have been reached.

It requires a very clear case to justify changing the construction of a law, conceded to be somewhat involved, which has been uninterruptedly acquiesced in for so long a period as fifty years. It is firmly the opinion of the court, for reasons we have endeavored to state with the fulness the importance of the case demands, that a situation justifying a change does not exist as to the matter in question.

We should say, in passing, that amendments were proposed in the constitutional convention placing the usual restrictions upon changing the salary of a justice of this court, in an appropriate section in the article on the judiciary, but it was not done, as we have seen.

So the conclusion is that the judicial term mentioned in art. VII of the constitution has regard, primarily, to the office, disassociated from the occupant of it; in other words, it contemplates unity, so that several incumbents during the term take mere parts of an entirety; that "his term of office," as used in sec. 26, art. IV, of the constitution, has regard, primarily, to the personal element, the incumbent of the office; contemplates the period of incumbency, whether of a whole term, or a part of the entirety, under art. VII. As to the

particular incumbent's term of service, during its pendency, the legislature is under complete disability to change the salary incident in any manner or to any extent; but as to any period, within a whole term, filled by appointment or election, the legislature has power, before the commencement thereof, to fix the compensation, different from that incident to the office during the preceding period.

*By the Court.*—The prayer of the petitioner is granted.

TIMLIN, J. (*concurring*). As I view this matter the only question involved is whether one appointed by the governor to fill a vacancy in the office of justice of the supreme court, which vacancy was caused by the death of the prior incumbent of that office, takes the salary fixed by statute enacted and in force prior to his appointment, but not applicable to the salary of his deceased predecessor in office because enacted, approved, and published after the term of such deceased predecessor had begun.

I reach the same conclusion as the majority, but solely upon the following grounds: Precedents from other states have little advisory value in questions of interpretation, because, however nearly like the words in question may be to those in other state constitutions, they are not identical nor found in like collocation, nor affected similarly by other cognate expressions elsewhere found in the instrument. This weakness of such precedents has been often noted in questions of interpretation. The provision of our constitution relating to increase or diminution of salary is not limited to judicial offices, but includes all public officers, and appears as a general limitation upon legislative power. It restricts the power of the legislature with reference to different classes of persons; relates to the officer, not to the office, to his term, not to the term. It is as follows:

"Sec. 26. The legislature shall never grant any extra compensation to any public officer, agent, servant or contractor after the services shall have been rendered or the contract en-

tered into; nor shall the compensation of any public officer be increased or diminished during his term of office."

I construe this as wholly personal to each of the classes therein mentioned, including the "public officer," and the expression "during *his* term of office" accords with this construction. Otherwise the framers of the constitution would have used the expression "public office" instead of "public officer," and "the term" instead of "his term."

Again, in other sections of the same instrument where cognate restrictive provisions are found, the words employed are significantly different. As in sec. 10, art. VII, prohibiting judges from holding any other office, it is said:

"They shall hold no office of public trust, except a judicial office, during the term for which they are respectively elected."

Or sec. 12 of art. IV, which provides:

"No member of the legislature shall, during the term for which he was elected, be appointed or elected to any civil office in the state which shall have been created or the emoluments of which shall have been increased during the term for which he was elected."

The contention of the learned attorney general is that sec. 26 above quoted should be construed as if it read, "during the term for which the first incumbent was elected," instead of "during his term," and as if it applied to the salary fixed at the beginning of the official term of the first incumbent regardless of change of incumbents during this period or term. I think this would be giving the words "public officer" the meaning of "public office," and the personal "his term" the meaning of the different impersonal expression, "the term," and that such construction varies from the usual and ordinary meaning of these words and is therefore inadmissible.

I am convinced that the main purpose of sec. 26, *supra,* is to make public officers independent of the legislative branch of the government as far as possible, and to prevent the in-

fluence upon the legislative branch of a combination of in-
terested officeholders in an effort to raise their salaries, and
these purposes should be considered in construing the provi-
sion in question.    I do not approach this question of construc-
tion from the viewpoint of taking the constitutional official
term as a unit and dividing this unit into as many fractions
as there may happen to be official incumbents during that
term, but I regard the provision as personal to the incumbent
of the office.    If he enters the office after the change of the
salary has taken place he is entitled to that salary, and as to
him it cannot be increased or diminished; but if the office is
vacated by death or otherwise before the expiration of the
term the succeeding incumbent takes the office with the sal-
ary fixed by the legislature for that office and in force at the
time of the appointment or election of the succeeding incum-
bent, even though such appointment or election be for part
of an unexpired term.    I am strengthened in this view be-
cause this construction of the constitution was arrived at by
Chief Justice WHITON and by Chief Justice COLE, both of
whom took part in framing the constitution, and by Chief
Justice RYAN and Justice PAINE, and others, in drawing and
accepting salaries pursuant to this interpretation.    The leg-
islative and executive branches of the state government also
put this construction upon the constitution by the enact-
ment of ch. 33, Laws of 1867, ch. 145, Laws of 1868, and
ch. 293, Laws of 1873, in each of which statutes it was
provided that the increased salary of judges of this court
should apply to judges thereafter appointed.    As no ap-
pointment could be made except to fill out part of an un-
expired term, the legislature which enacted, and the governor
who approved, these laws considered it not in violation of the
constitution that the appointee thereafter appointed to fill out
any part of the then existing terms should have the increased
salary during "his term."    So the departmental officers of the
state for nearly half a century have put this construction upon

the provision of the constitution in question.    All this seems.
to me to much outweigh the advisory effect of foreign judicial
precedents upon questions of construction of somewhat simi-
lar though not identical provisions, and I have no doubt and
have had but little difficulty in arriving at the conclusion that.
the true interpretation of sec. 26, art. IV, of the state consti-
tution is that he who comes into an office lawfully by election
or appointment to fill a vacancy caused by the death, disabil-
ity, resignation, or removal of a different prior incumbent is.
not under the restrictions as to increase or diminution of sal-
ary which bound the prior incumbent, but takes under the
law in force at the time of his appointment or election to fill,
the vacancy.

SIEBECKER and BARNES, JJ., took no part.