STATE EX REL. ZIMMERMAN, Petitioner, vs. DAMMANN, Secretary of State, and another, Respondents.

*December 3, 1929—March 4, 1930.*

*Henry S. Sloan* of Milwaukee, for the petitioner.

For the respondents there was a brief by the *Attorney General* and *J. E. Messerschmidt* and *Frank W. Kuehl,* assistant attorneys general, and oral argument by *Mr. Kuehl* and *Mr. Messerschmidt.*

The following opinion was filed January 7, 1930:

ROSENBERRY, C. J.  A considerable part of the brief for the respondents is devoted to a statement of the value and extent of the services rendered by members of the legislature under present-day conditions.  It is hardly necessary for us to say that we fully appreciate the importance and character of the services rendered and their value to the state and to the people of this state.  We fully recognize the fact that the compensation heretofore paid has been inadequate and that considered with reference to the time spent and value

of the services rendered-the sums provided for by ch. 427 of the Laws of 1929 are no more than a just and adequate compensation.

These considerations, however, should have little if any weight in determining what the power of the legislature is with respect to increasing the compensation of members of the legislature during their present term of office. We are concerned here with a question of constitutional law involving the fundamental public policy of the state, not with one of adequate compensation. The constitutionality of the act itself is not drawn in question. The question presented is, Does the prohibition against increasing the compensation of a public officer apply to the present members of the legislature so as to prevent them from accepting the increased compensation provided for by ch. 427 of the Laws of 1929 during their present term of office?

Sec. 26 of art. IV of the constitution of the state of Wisconsin, entitled "Legislative," provides as follows:

"The legislature shall never grant any extra compensation to any public officer, agent, servant or contractor, after the services shall have been rendered or the contract entered into; nor shall the compensation of any public officer be. increased or diminished during his term of office."

It is first urged that by a practical construction extending over a period of more than fifty years, the section in question has been considered to be not applicable to members of the legislature. This argument is based upon the fact that it was provided in the original constitution by sec. 21 of art. IV that the compensation of members of the legislature should be $2.50 for each day's attendance; that by amendment adopted in 1867 this compensation was increased to $350 per annum, and that all of the holdover senators during the season of 1868 were paid and accepted the increased compensation upon the basis of this practical con-

struction. We are urged to follow *State ex rel. Bashford v. Frear,* 138 Wis. 536, 556, 120 N. W. 216, where it is said:

"It requires a very clear case to justify changing the construction of a law, conceded to be somewhat involved, which has been uninterruptedly acquiesced in for so long a period as fifty years."

It is quite obvious that the argument that sec. 26 of art. IV has in this manner received a practical construction which we should follow, is beside the point. Sec. 26 is by its terms a limitation upon the power of the legislature and not a limitation upon the power of the people to amend the constitution. The constitution in no way attempted to limit the power of the people to amend it,—a futile enterprise if undertaken. The holdover members of the legislature who served in 1868 received their salaries pursuant to and by virtue of an amendment to the constitution and not pursuant to and by virtue of an act of the legislature. Sec. 26 was by its terms in no way applicable to salaries increased by way of constitutional amendment. It has been so held. *Waldrop v. Henry,* 207 Ala. 128, 92 South. 425; *People v. Stong,* 67 Colo. 599, 189 Pac. 27; *Stone v. Pryor,* 103 Ky. 645, 45 S. W. 1053, 1136; *Comm. v. Moore,* 266 Pa. St. 100, 109 Atl. 611.

It is next urged that when the framers of our constitution used the terms *any civil office in this state* in sec. 12 of art. IV, *any public officer* in sec. 26 of art. IV, and *all civil officers of this state* in sec. 1 of art. VII, they did not intend the same to apply to members of the legislature. Sec. 1 of art. VII provides:

". . . The house of representatives shall have the power of impeaching all civil officers of this state for corrupt conduct in office," etc.

The familiar and elementary rule that it is the duty of the court to discover and give effect to the intent of the legislature in construing a statute is equally applicable to the con-

stitution, and the intent and purpose of the framers of the constitution should therefore be a guide to its application and interpretation. To discover that intent reference may be had to other provisions of the constitution, to the history of the times, the state of society at the time when the constitution was framed and adopted, and to prior well-known practices and usages. See 6 Ruling Case Law, p. 50, § 45 *et seq.*, and cases there cited. It is also a rule of construction that words used in constitutions and statutes should be given their obvious and ordinary meaning unless some situation makes it imperatively necessary to construe it otherwise in order to arrive at the intent.

Nothing would seem to be more obvious than that the framers of the constitution did not intend by art. VII, sec. 1, to authorize the impeachment by the legislature of its own members. The history of constitutions and impeachment trials contains no suggestion of the exercise by a legislative body of any such power. That the framers of the constitution did not so intend is emphasized by the provisions of sec. 8 of art. IV, which provides:

"Each house may determine the rules of its own proceedings, punish for contempt and disorderly behavior, and, with the concurrence of two thirds of all the members elected, expel a member; but no member shall be expelled a second time for the same cause."

By the terms of sec. 8 a much more expeditious and summary method is provided by which each house may rid itself of offending members. If a doubt could be entertained in regard to the meaning of sec. 1 of art. VII, sec. 8 of art. IV makes it clear that it should be interpreted as if it read "all other civil officers."

It is next urged that by the use of the term *any civil office* in sec. 12 of art. IV, it is apparent that the framers of the constitution did not consider that the term *civil office* included members of the legislature and that therefore the

term *public officer* in sec. 26 should be construed to be synonymous with the term *civil office* in sec. 12; that if the term *civil office* as used in sec. 12 be construed to include members of the legislature, then no member of the legislature who voted to increase the salaries of members of the legislature could thereafter, during the term for which he was elected, be a candidate to succeed himself. It is considered that a reasonable interpretation of sec. 12 does not require us to arrive at the conclusion which constitutes the principal premise of the argument made in support of respondents' proposition.

Sec. 12 of art. IV is as follows:

"No member of the legislature shall, during the term for which he was elected, be appointed or elected to any civil office in the state which shall have been created, or the emoluments of which shall have been increased, during the term for which he was elected."

As originally framed and adopted, sec. 12 of art. IV of the constitution could not by any possibility have been applied to members of the legislature. The office of member of the legislature was created by the constitution. It is true that it was provided by the constitution that the number should not be less than fifty-four nor more than one hundred in the assembly and that the senate should be composed of not more than one third of the number in the assembly. By the constitution as originally adopted the state was divided into nineteen senatorial districts and sixty-six assembly districts. The legislature was by sec. 3 of art. IV authorized to provide for an enumeration of the inhabitants of the state in the year 1855 and at the end of every ten years thereafter, and was directed at the session after such enumeration, and also after each enumeration made by the authority of the United States, to apportion and district anew the members of the senate and assembly. In subsequent years and in succeeding apportionments as additional districts were created pur-

suant to the provisions of the constitution, the newly-created districts were represented by members of the assembly or by member of the senate as the case might be, and it was not until the adoption of ch. 634 of the Laws of 1917 that it was declared that the senate should consist of thirty-three members and the assembly of one hundred members. This was a revisor's bill, and a declaration was made apparently for the purpose of making definite and clear the number of persons entitled to sit in each body, as there were at that time thirty-three senatorial districts and one hundred assembly districts. While most, perhaps all, of the apportionments provided that each assembly district should be represented by one assemblyman and each senatorial district by one senator, that declaration added nothing whatever to the act, as that result followed from the language of the constitution itself. The legislature could not create the office of member of the legislature. It could create a district by apportionment, which district when created the constitution provided should be represented by a person to be known as an assemblyman or senator as the case might be.

In its original form the constitution, by the provisions of sec. 21 of art. IV, fixed the salaries of members of the legislature, and being fixed by the constitution, such salaries could not be increased or diminished by the legislature but only by constitutional amendment. *State ex rel. Polley v. Anderson,* 31 S. Dak. 261, 140 N. W. 736; *State ex rel. Weldon v. Thomason,* 142 Tenn. 527, 221 S. W. 491.

During the history of the state many amendments to sec. 21 have been proposed. As already indicated the compensation was increased in 1867 and it was again increased by amendment adopted in 1881. It thus conclusively appears that sec. 12 could not have been intended by the framers of the constitution to apply to members of the legislature. It was the quite evident intent and purpose to place a disqualification upon the members of the legislature which

would prevent them from holding any office created by the legislature or any office the emoluments of which had been increased by the legislature of which they were members. Sec. 12 has been under consideration by this court a number of times, and in each instance it has been held, where the question has been presented, that the section should be strictly and narrowly construed in favor of eligibility. *State ex rel. Johnson v. Nye,* 148 Wis. 659, 135 N. W. 126; *State ex rel. Ryan v. Boyd,* 21 Wis. 208. To now hold that because of the abrogation of sec. 21 and because the power to fix salaries of members of the legislature is now vested in the legislature and that it is possible by definition to include within the term *civil offices* members of the legislature, that therefore sec. 12 should be held applicable to members of the legislature and that members of the legislature voting to increase legislative salaries should be disqualified from being candidates to succeed themselves, would not be in accord with the purposes of the framers of the constitution and would place upon the section a strict construction against eligibility instead of in favor of it, as it is held in the cases cited to be our duty to do. This conclusion is emphasized further because, if sec. 12 be so construed, voting to increase the compensation of the members of the legislature would disqualify all the members of this or any subsequent legislature so voting from being candidates to succeed themselves, during the term for which they were elected,—a result which could not have been within the contemplation of the framers of the constitution or those who proposed and the people who voted for the amendment in 1929, which abrogated sec. 21.

It is considered that sec. 12 does not, when properly construed, prevent a member of the legislature who votes for the increase of legislative salaries from being a candidate to succeed himself. The conclusion at which we have arrived

finds further support in a general principle of law that eligibility for office is to be determined as of the time the person assumes the duties of the office, and that a person who by reason of alienage, non-age, or similar reason is not eligible at the time he is voted for, but becomes such before he is required to assume the duties of the office, is properly elected to office. See *State ex rel. McKeever v. Cameron,* 179 Wis. 405, 192 N. W. 374, and cases there cited.

In 1881 sec. 21 of art. IV was amended to read as follows:

"Each member of the legislature shall receive for his services for and during a regular session the sum of five hundred dollars, and ten cents for every mile he shall travel in going to and returning from the place of meeting of the legislature on the most usual route. In case of an extra session of the legislature, no additional compensation shall be allowed to any member thereof, either directly or indirectly, except for mileage, to be computed at the same rate as for a regular session. No stationery, newspapers, postage or other perquisites, except the salary and mileage above provided, shall be received from the state by any member of the legislature for his services or in any other manner as such member."

It is argued that if it had been supposed at the time of the adoption of the amendment of 1881 that sec. 26 was applicable to members of the legislature, the provisions so strictly limiting additional compensation and perquisites were not necessary and that therefore it must have been the opinion of those who framed and who voted for the amendment that sec. 26 did not so apply. The provisions relating to extra compensation and perquisites give a basis for an argument equally if not more persuasive in support of the contrary position. It must be remembered that the amendment of 1881 was framed by members of the legislature, not by a constitutional convention, it having been submitted pursuant to joint resolution adopted by both houses. It must there-

fore have been in the minds of the legislature that in order to resist the pressure put upon it to provide additional compensation and perquisites, it was necessary to make the amendment of 1881 much more explicit and restrictive than was the section prior to its amendment. This precaution was no doubt due to the fact that similar constitutional amendments had received widely variant interpretations. It had been held that by the addition of new duties the legislature was not prohibited from increasing the salaries for the performance of such duties. See note to *Moore v. Nation,* 18 Am. & Eng. Ann. Cases, p. 397, at p. 404. Attempts were made by way of providing office space, clerical aid, and other similar devices to evade at least the spirit of the prohibition. The framers of the amendment of 1881 who were members of the legislature must have thought that the terms of the amendment were in accord with the public policy of this state as declared by its constitution and laws. They must also have been of the opinion that the temptation to seek ways of evading the constitutional limitation as to salary was greater with respect to members of the legislature than other public officers because they made the amendment of 1881 much more explicit in that regard than was the provision of sec. 26. Instead of being a support to the argument made by the respondents that the language of the amendment of 1881 supports the position of the respondents, it is considered to be more persuasive the other way.

The term *officer* is used in the constitution a number of times. In sec. 25 of art. IV it is said:

" . . . no member of the legislature or other state officer shall be interested, either directly or indirectly, in any such contract."

In sec. 28 of art. IV it is said:

"Members of the legislature, and all officers, executive and judicial, except such inferior officers as may be by law exempted, shall . . . take and subscribe an oath," etc.

Sec. 11 of art. XIII, introduced by way of amendment in 1902, relating to the use of passes, etc., provides:

"Any violation of any of the above provisions shall be bribery and punished as provided by law, and if any officer or any member of the legislature be guilty thereof, his office shall become vacant."

In sec. 12 of art. XIII, introduced by way of amendment in 1926, relating to recall, it is provided:

"The qualified electors of the state or of any county or of any congressional, judicial or legislative district may petition for the recall of any elective officer after the first year of the term for which he was elected," etc.

Various arguments may be based upon the use of the word *officer* in these various provisions of the constitution, some of which tend to support the contention of the respondents and some those of the relator. It is considered that a question of such a weighty and far-reaching character as that under consideration here ought not to be determined by the consideration of small and comparatively inconsequential matters. The question involved here is one relating to the public policy of the state, and such an interpretation should be placed upon the constitution as it now stands after the amendment of 1929 as will accord with sound public policy, and we shall enter upon a determination of the question upon that basis.

It may be true that the framers of our constitution had more prominently in mind than anything else the experience of the English people under acts of parliament. By controlling the salaries of judges and civil officers parliament was able to take unto itself almost unlimited power. The primary purpose of the framers of our constitutions, state and national, was to vest the three primary powers of government in the three primary branches of government and then by a system of checks and balances preserve so far as possible the powers of each co-ordinate department. It was foreseen

that if the power to fix salaries was left in the hands of the legislature without limitation, it might be so exercised as to destroy the balance of the constitutional structure. However, it is equally true that the experience of the country had demonstrated that one of the growing evils was that whereby members of the legislature procured the creation of offices, fixed the emoluments thereof, and increased the emoluments of others with the hope and expectation that they might by way of appointment or election enjoy the fruits of their legislative labors.

The purpose of these constitutional provisions may be briefly stated as follows: (1st) to secure so far as possible the independence of each co-ordinate branch of the government (*State ex rel. Jackson v. Porter*, 57 Mont. 343, 188 Pac. 375); (2d) to protect the public against the evil of letting a public official use his official power and influence to augment his own salary (*James v. Barry*, 138 Ky. 656, 128 S. W. 1070); (3d) to protect individual officers against legislative oppression which might flow from party rancor, personal spleen, enmity, or grudge (*State ex rel. Gilbert v. Board of Comm'rs Sierra County*, 29 N. M. 209, 222 Pac. 654, 31 A. L. R. 1310); and (4th) to prevent persons, while possessed of the prestige and influence of official power, from using that power for their personal advantage (*Folk v. St. Louis*, 250 Mo. 116, 157 S. W. 71). See 22 Ruling Case Law, p. 533, § 228, and cases cited; 46 Corp. Jur. 1021, § 254, and cases cited.

It is true that at the time of the adoption of the constitution sec. 26 did not apply to members of the legislature because of the separate provision contained in sec. 21. That was due, however, to the peculiar structure of the constitution at that time. The more pertinent question is, What did those who framed and supported the amendment to the constitution in 1929 understand the situation would be after the adoption of that amendment? They had before them sec. 26, which prohibited the legislature from increasing or

diminishing the compensation of any public officer during his term of office. Did they suppose that after the abrogation of sec. 21 by the amendment of 1929, by which the power to fix salaries became vested in the legislature, that members of the legislature would not be included in the term *public officer* and that members of the legislature might increase their own salaries during their term of office, while they could not increase or diminish that of any other public officers? The question under consideration does not arise because of any doubt as to the proper interpretation of the constitution when originally adopted, but because of the doubt as to its meaning after the adoption of the 1929 amendment. What the intent and purpose of those who framed and supported the amendment of 1929 was, is therefore within the scope of our inquiry.

An effort to answer these questions leads us to a consideration of the meaning of the term *public officers* as used in sec. 26. We realize fully that a matter of this kind ought not to be determined wholly upon the basis of dictionary definitions; that what is to be sought is the intent as expressed in the constitution as amended. That the term *public officers* was at the time of the adoption of the constitution generally understood to include members of the legislature as well as members of other co-ordinate branches of the government can scarcely be doubted.

In *U. S. ex rel. Noyes v. Hatch,* 1 Pin. 182, decided at the July term, 1842, six years before the constitution was framed, the court said:

"Laying aside the position that this office of canal commissioner was not contemplated by Congress at the enactment of the organic law, it may be inferred that the term *civil officers* was intended to embrace such officers as in whom part of the sovereignty or municipal regulations, or general interests of society, are vested; and that such has been the general understanding in the states, under their constitutions, is known to citizens of experience and observation."

In the opinion is a quotation from the supreme judicial court of Maine:

"The terms *office* and *officers* as used in the constitution of Maine, where it prescribes an oath of office to all legislative, executive, and judicial officers, imply a delegation of a portion of the sovereign power to, and possession of it by, the person filling the office, and that a person clothed by a resolve of the legislature with no other powers than those of superintending the public lands and performing certain acts relating to them, under the discretionary regulation of the governor, was not an officer, and therefore was not required to take the oath."

In *Hall v. State,* 39 Wis. 79, 85, the case of *U. S. ex rel. Noyes v. Hatch, supra,* was referred to with approval, and in the *Hall Case* it is said:

"It may safely be asserted that any person charged by law with the performance of public functions affecting the general interests of society, especially if he be elected thereto by the people, or appointed directly by the legislature, and who receives his compensation out of the public treasury, is a public officer, and as such can have no vested right in his office, unless secured by the constitution."

*Hall v. State* was affirmed by this court in *In re Appointment of Revisor,* 141 Wis. 592, 608, 124 N. W. 670. It is there said:

"The doctrine is well-nigh universal that the duties must be continuous and permanent, and not merely transient, occasional, or incidental." Citing *State ex rel. Brown County v. Myers,* 52 Wis. 628, 9 N. W. 777.

In *Butler v. Regents of the University,* 32 Wis. 124, it was held that a professor in the State University was not a public officer in the sense that it excluded the existence of a contract relation between himself and the board of regents that employed him.

In *Sieb v. Racine,* 176 Wis. 617, 187 N. W. 989, in dis-

cussing the question of whether or not the superintendent of schools was a public officer, the court said:

"The question whether a given employment constitutes the one selected for its discharge an officer or a mere employee is often a difficult one. The line between the two is frequently shadowy and difficult to trace. In examining sec. 926—115 [relating to superintendent of schools], however, we find an absence of many of the recognized characteristics of an office. There is no definite term; the appointee is not required to take an oath; he exercises none of the functions of sovereignty, unless it be in the matter of licensing teachers. While, possibly, these are not indispensable, they are usual characteristics of an office."

And it was there held that the superintendent of schools was not a public officer. *In re Nagler,* 194 Wis. 437, 216 N. W. 493.

Members of the legislature are chosen for a definite term; they exercise a part of the sovereign power of the state; their duties are definite and specific; they are paid from the public treasury and answer every call of any recognized definition of a public officer. See Mechem, Public Officers, p. 1 *et seq.;* 46 Corp. Jur. p. 922 and cases cited.

As was said by the court of appeals of New York in *Rowland v. Mayor, etc.* 83 N. Y. 372:

"Whether we look into the dictionary of our language, the terms of politics, or the diction of common life, we find that whoever has a public charge or employment, or even a particular employment affecting the public, is said to hold or be in office." For a number of examples see 46 Corp. Jur. p. 925, note 51.

A consideration of these and other authorities convinces the court that the term *public officers,* used without qualification or restriction as it is in sec. 26, must be held to include members of the legislature and that it was so understood at the time of the adoption of the constitution as well as in 1929 when sec. 21 was abrogated.

It is further urged that by the abrogation of sec. 21, the amendment not continuing the constitutional salaries then in force, that the holdover senators of the present legislature will be without any salaries during the last two years of the term for which they were elected. This is true if the legislature of 1931 fails to take any action with respect to such salaries. The provisions of sec. 26 of art. IV, however, will not prevent the next legislature from providing for the holdover senators the same salaries which they received under sec. 21 before its abrogation. Such action will neither increase nor diminish the salary; it will merely continue it. If such legislative action is then taken, the holdover senators will receive their compensation pursuant to an act of the legislature and not pursuant to the provisions of the constitution. It must be assumed that the legislature of 1931 will discharge a duty so obviously indicated by considerations of justice and public policy.

Manifest considerations of public policy already adverted to as well as the language of sec. 26, whether the term *public officer* be defined in a broad and liberal way or be taken in a narrow and restricted sense, require us to hold that members of the legislature fall within the constitutional purpose as well as within the language of sec. 26 since the abrogation of sec. 21. We have given careful consideration to all of the authorities cited and arguments made in support of the position taken by the respondents in this case, and we are obliged to reach the conclusion that the respondents are not warranted in disbursing public moneys on account of salaries of the members of the present legislature during their present terms of office in excess of the amount received by them as prescribed by the amendment of 1881.

*By the Court.*—Let the writ issue as prayed in the petition.

A motion for a rehearing was denied, without costs, on March 4, 1930.