Richard E. JACOBS, David H. Jacobs, R. F. Coffin, The Northwestern Mutual Life Insurance Company, J & C Associates, Co-Partners, using the name of Madison Joint Venture, Plaintiffs-Appellants-Cross-Respondents-Petitioners,

v.

Robert W. MAJOR and Nu Parable, an unincorporated association, Defendants-Respondents and Cross-Appellants.

Supreme Court

*No. 85–0341. Argued March 3, 1987.—Decided June 23, 1987.*

(Also reported in 407 N.W.2d 832.)

494

For the plaintiffs-appellants and cross-respondents-petitioners there were briefs by *Trayton L. Lathrop, Michael J. Lawton, David E. Rohrer, Jill W. Dean* and *Isaksen, Lathrop, Esch, Hart & Clark,* Madison, and oral argument by *Trayton L. Lathrop.*

For the defendants-respondents and cross-appellants there was a brief by *Jeff Scott Olson* and *Julian & Olson, S.C.,* Madison, and oral argument by *Jeff Scott Olson.*

STEINMETZ, J.   The principal issue in this case is whether Article I, sec. 3 of the Wisconsin Constitution[1] requires the plaintiffs, owners of private proper-

---

[1] Article I, section 3 of the Wisconsin Constitution provides as follows:

ty (the East Towne and West Towne Malls), to permit non-consensual use of their facilities by others for freedom of speech purposes.

The plaintiffs raise the further issue of whether they were denied procedural due process by the holding of the court of appeals that they were not entitled to their claims for damages and injunctive relief in full.

The plaintiffs received a temporary injunction from the Dane county circuit court, the Honorable William D. Byrne, on June 1, 1984, enjoining the defendants and all others "acting ... in concert with them" from entering either East Towne or West Towne except as bona fide shoppers. Due to an alleged subsequent violation of the injunction, a contempt proceeding was instituted. A contempt hearing was held but the trial court declined to entertain the merits of the motion and instructed the plaintiffs to institute a separate action. After subsequent alleged violations of the injunction, the trial court held the contemnors in contempt for their activities and fined them $250, or in the alternative, if not paid in 20 days, seven days in the Dane county jail.

The trial on plaintiffs' complaint took place in January of 1985. As a result, the trial court entered

"**Free speech; libel.** SECTION 3. *Every person may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that right, and no laws shall be passed to restrain or abridge the liberty of speech or of the press.* In all criminal prosecutions or indictments for libel, the truth may be given in evidence, and if it shall appear to the jury that the matter charged as libelous be true, and was published with good motives and for justifiable ends, the party shall be acquitted; and the jury shall have the right to determine the law and the fact." (Emphasis added.) It is the italicized portion that is in issue.

judgment permanently enjoining defendants "from performing in any way upon plaintiffs' property, and denying plaintiffs' request for nominal and compensatory damages." Plaintiffs appealed from all of the judgment which "expressly or impliedly denies or fails to grant all of the relief requested ...." Defendants cross-appealed alleging infringement of their right of free expression under Wisconsin Constitution Article I, sec. 3.

The court of appeals affirmed and held that the trial court recognized an established threat and granting injunctive relief to that threat was reasonable. *Jacobs v. Major,* 132 Wis. 2d 82, 390 N.W.2d 86 (Ct. App. 1986).

The facts are that the plaintiffs are the owners of two large shopping malls in Madison known as the East Towne Shopping Center and the West Towne Shopping Center. Robert Major, a defendant, was a graduate student at the University of Wisconsin at the time of trial. Defendant, Nu Parable, is an unincorporated dance troupe organized by Major and others to publicly perform a choreographed depiction of the results of nuclear warfare as a political statement.

East Towne and West Towne malls are large, enclosed shopping centers containing 95 and 66 tenant stores respectively. Each of the malls also adjoins and is attached to a number of independent "anchor" department stores. Plaintiffs' rental income from the mall is generated largely through the combination of a base rent and a percentage of tenants' sales.

Interior corridors, owned by plaintiffs, connect the leased stores and the independent department stores. These corridors are climate controlled and contain numerous fountains, plantings of tropical foliage and carpeted seating areas. The costs of mall

maintenance and private security service are borne by the tenants.

The tenants of each mall have formed merchants' associations which, among other things, schedule activities designed to attract shoppers in the interior corridors. These activities are subject to the approval of plaintiffs' mall managers. Since the opening of the malls in the early 1970's, plaintiffs have maintained a strict policy prohibiting religious activities, leafletting, handbilling or soliciting of shoppers on the premises.

Major formed Nu Parable in early 1984 as a low budget performance group using only dance and costume to symbolically convey its message about nuclear war. The costume was a red shirt bearing a black and yellow fallout shelter symbol. The dance involved ten to twelve dancers, lasted about five minutes and concluded with a "die-in" in which bystanders were invited to join the dancers in lying motionless on the floor for several minutes. The troupe followed its performances with leafletting.

Nu Parable's first public dances took place at a United States Post Office, at a public park in Madison and in the State Capitol rotunda. In March, 1984, Major approached East Towne Assistant Manager Earl VanderWielen regarding a performance in the mall. VanderWielen told Major the performance involved potentially controversial issues and refused to approve it.

On April 12, 1984, Major hand delivered a form letter to as many store managers within the mall as he could find. The letter explained the Nu Parable dance, expressed the intent to perform it within the mall on Saturday, April 21, 1984, and solicited the support and cooperation of the merchants. Mall man-

agement asked Major to stop distributing the letters, but he refused to do so.

On April 18, 1984, plaintiffs brought this action and obtained a temporary restraining order barring defendants from entering East Towne mall except as shoppers. About one week later, Major and another Nu Parable member distributed a similar letter to West Towne merchants, expressing the intent to dance there on Saturday, May 5. On May 1, 1984, the plaintiffs' complaint was amended to include West Towne and another restraining order was issued covering those premises.

Defendants filed an answer to the complaint and a counterclaim. The counterclaim alleged that plaintiffs' ban on "political, religious and artistic expression" in their malls violated defendants' rights under Article I, sec. 3 of the Wisconsin Constitution.

Major, Samuel Day, Jr. and others entered East Towne mall on May 19, 1984, and distributed leaflets providing in part:

> "Nu Parable wants to dance for you at East Towne Mall but has been legally restrained from doing so by the Ohio corporation which owns the shopping center....
>
> "[M]ake your views known to the shopkeepers here. Ask them to tell mall manager David Van Dusen that they support peace and free speech at East Towne Mall."

A similar leaflet was distributed on May 26 at West Towne. In each instance, participants leafletted without plaintiffs' consent and refused to leave when requested to do so.

As stated earlier, plaintiffs received a temporary injunction on June 1, 1984, enjoining defendants and

all others "acting ... in concert with them" from entering either East Towne or West Towne except as bona fide shoppers. On June 6 and 20, Day and others distributed "Friends of Nu Parable" leaflets at West Towne and East Towne respectively. Contempt proceedings were instituted against Day on June 21.

A contempt hearing was held on June 29, 1984. The trial court declined to entertain the merits of the motion and instructed plaintiffs to institute a separate action against Day. Day's alleged violation of the temporary injunction was claimed to be in concert with the other defendants, and, therefore, he should not have been dismissed before the contempt hearing, but his actions should have been considered with the alleged contemptous actions of the other defendants. The court of appeals denied plaintiffs' petition for supervisory relief, and a separate injunction action was subsequently commenced against Day and others. Day continued leafletting at both West Towne and East Towne malls.

On August 9, 1984, Major, William Mutranowski and three others entered East Towne mall in costume. Mall security personnel asked them not to perform, but the troupe danced and handed out leaflets to mall patrons. The newspapers, radio and television covered the event. According to the record, several stores within the mall suffered identifiable reductions in sales that day.

On August 21, 1984, the trial court held Major, Mutranowski and the other dancers in contempt for their activities on August 9th and fined them with two days to pay or, in the alternative, seven days in the Dane county jail. Day and others continued to periodically distribute leaflets at both malls as the "Family of Nu Parable," as "Disarmament Now" and as "Friends

of the Bill of Rights." There were no further dances in the malls.

The trial on plaintiffs' complaint took place in early January of 1985. On January 23, the court entered judgment permanently enjoining defendants "from performing in any way upon plaintiffs' property," and denying plaintiffs' request for "nominal and compensatory damages." Plaintiffs appealed from all of the judgment which "expressly or impliedly denies or fails to grant all of the relief requested." Defendants cross-appealed alleging infringement of their rights of free expression under Wisconsin Constitution Art. I, sec. 3.

The issue to be resolved has already been decided by the United States Supreme Court as to the application of the United States Constitution. The United States Supreme Court discussed and interpreted *Lloyd Corp. v. Tanner,* 407 U.S. 551 (1972) in *PruneYard Shopping Center v. Robins,* 447 U.S. 74, 81 (1980), wherein it stated:

> "*Lloyd* held that when a shopping center owner opens his private property to the public for the purpose of shopping, the First Amendment to the United States Constitution does not thereby create individual rights in expression beyond those already existing under applicable law." *See also Hudgens v. NLRB,* 424 U.S. 507, 517–521 (1976).

In *Lloyd,* 407 U.S. at 569, the Court stated:

> "[That] property [does not] lose its private character merely because the public is generally invited to use it for designated purposes. . . . The essentially private character of a store and its privately owned abutting property does not change by virtue

501

of being large or clustered with other stores in a modern shopping center."

In *PruneYard Shopping Center,* 447 U.S. at 81, the Supreme Court stated:

> "Our reasoning in *Lloyd,* however, does not *ex proprio vigore* limit the authority of the State to exercise its police power or its sovereign right to adopt in its own Constitution individual liberties more expansive than those conferred by the Federal Constitution. *Cooper v. California,* 386 U.S. 58, 62 (1967). See also 407 U.S. [*Lloyd*] at 569–70."

Therefore, the defendants argue their freedom of expression is protected in the East Towne and West Towne malls through Art. I, sec. 3 of the Wisconsin Constitution.

As we stated in *State v. Beno,* 116 Wis. 2d 122, 136, 341 N.W.2d 668 (1984):

> "We have previously articulated the analysis which a court should employ in interpreting provisions of the Wisconsin Constitution. *Buse v. Smith,* 74 Wis. 2d 550, 568, 247 N.W.2d 141 (1976); *Board of Education v. Sinclair,* 65 Wis. 2d 179, 222 N.W.2d 143 (1974). We have said that the court will examine:
>
> "'(1) The plain meaning of the words in the context used;
>
> "'(2) The historical analysis of the constitutional debates and of what practices were in existence in 1848, which the court may reasonably presume were also known to the framers of the 1848 constitution, *see State ex rel. Zimmerman v. Dammann* (1930), 201 Wis. 84, 88, 89, 228 N.W. 593; and *State ex rel. Comstock [v. Joint School District,* 65 Wis. 631, 27 N.W. 829 (1886)]; and

"'(3) The earliest interpretation of this section by the legislature as manifested in the first law passed following the adoption of the constitution. *Payne v. Racine* (1935), 217 Wis. 550, 259 N.W. 437.' *Buse v. Smith,* 74 Wis. 2d 550, 568, 247 N.W. 141 (1976)."

In *Beno* the court found the term "civil process," which was not defined in the constitution, not to have a plain meaning and, therefore, the court continued the examination for meaning "by looking at the objectives of the framers in adopting the provision." *Id.* at 138. The court then followed the rules of *Sinclair* and *Buse* by looking "for the nineteenth century plain meaning of the phrase 'liable in any civil action.'" *Id.* at 139. Finally, for resolution, the court considered "the objectives the framers sought to achieve." *Id.* at 141.

In *Beno* this court understood and properly looked to the historical foundation of the Wisconsin Constitution in determining meaning. This was necessary when the language of the section considered was not plain in meaning. That is not the situation in respect to Art. I, sec. 3.

The court of appeals concurring opinion in *Jacobs v. Major,* 132 Wis. 2d 82, by Judge Paul C. Gartzke, found the first independent clause of Art. I, sec. 3 to have plain meaning applying the presumption that protection from state action only was intended for the Bill of Rights provisions. The first clause provides only one reasonable meaning and that is the protection against state action. That "[e]very person may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that right ..." is obviously and without a doubt a right against state interference.

The same opinion found the second clause standing alone to have a plain meaning given the presumption of protection against state interference. This clause reads: "no laws shall be passed to restrain or abridge the liberty of speech or of the press." 132 Wis. 2d at 138. Without any doubt, this clearly prohibits the state from acting to restrain or abridge the liberty of speech or of the press.

The concurring opinion then found "possible redundancy" which could deprive the two independent clauses of plain meaning. The opinion therefore applied the remaining *Beno* tests and finally found Art. I, sec. 3 protects exclusively against state interference. We need go no further than holding that Art. I, sec. 3 has plain, unambiguous meaning that free speech is protected constitutionally against state interference. There cannot be a different understanding of Art. I, sec. 3 by reasonable persons and therefore there is no ambiguity. Whether language of a statute or constitutional provision is clear or ambiguous depends on the mind-set of the reader. Thus, two persons or groups can each have a different concept of the same words both reasonable but only one correct.

Article I, sec. 3 is not redundant. The two independent clauses are neither verbose nor repetitious in expressing the idea of the section. They are related to each other with the first expressing the right to free speech *and* the second stating the entity, the state, against whom the right is shielded.

So, though we are not required to go behind the language of Art. I, sec. 3 to discover its intent since the meaning is plain on its face, that meaning is consistent with what the history of the section shows, *i.e.,*

that it is state action that is restrained from interfering with the right to speech.[2]

In the concurring opinion of *Jacobs v. Major,* Judge Gartzke analyzed Wisconsin Constitution Article I, sec. 3 by applying this court's decision in *State v. Beno,* 116 Wis. 2d 122. In that concurring opinion, the following analysis was made:

> "The analysis [of *Beno*] requires a court first to examine the plain meaning of the words in the context used. *If the meaning is not plain,* the court then makes an historical analysis of the constitutional debate and of the practices in 1848 which may reasonably be presumed were known to the framers of the 1848 constitution." (Emphasis added.) *Jacobs v. Major,* 132 Wis. 2d at 126.

The concurring opinion then went on to apply the other factors of *Beno* and gave an accurate and scholarly recitation of the history of Article I, sec. 3 and the constitutional interpretation standards. This led Judge Gartzke to the conclusion that:

> "[T]he suggestion that a specific provision in the Declaration grants rights to persons enforceable against other private persons proposes a new direction. The proposal would work a change from withholding rights from government action to granting rights in every person enforceable against all other persons. To hold that a negative restraint on government creates a positive right assertable against all other persons would be a sharp and unexpected deviation from the apparent original course." *Jacobs v. Major,* 132 Wis. 2d at 137.

[2]For a further exhaustive exploration of Wisconsin constitutional history, we refer and encourage a reading of *Jacobs v. Major,* 132 Wis. 2d 82, the majority and concurring opinions.

Treatises have been written by legal historians and especially students of governmental constitutions in which there is common agreement that a declaration of rights in a state constitution is:

> "'[I]nserted in the constitution for the express purpose of operating as a restriction upon legislative power.' T. Cooley, *A Treatise on the Constitutional Limitations* 176 (Boston 1868). 'The separate states have also adopted constitutions which contain ... limitations upon the local governments. It is a fact, therefore, that the entire legislative and administrative power of the whole country, whether wielded by the nation or by the states, is subject to restraints ....' J. Pomeroy, *An Introduction to the Constitutional Law of the United States,* sec. 230, at 145 (New York 1868)." *Id.* at 132.

State constitution Bills of Rights set the limit beyond which "'no human legislation should be suffered to conflict with the rights declared to be *inherent and inalienable.'* W. Bateman, *Political and Constitutional Law,* sec. 16 at 14 n. 1 (St. Louis 1876) (emphasis in original)." *Id.* The primary purposes of a constitution are to establish a government, define or limit its powers and divide those powers among its parts. United States Constitution, Amendment X; J. Nowak, R. Rotunda and J. Young, *Constitutional Law,* 121 (2d ed. 1983). *See generally* 16 Am. Jur. 2d *Constitutional Law,* sec. 6 (1979). The United States Constitution established a government of limited and enumerated powers. Consequently, the national government possesses only those powers delegated to it. J. Nowak, *supra,* at 121. *See generally,* 16 Am. Jur. 2d at sec. 278. State constitutions, on the other hand, typically establish governments of general powers, which possess all power not denied by the state constitution. J.

Nowak, *supra,* at 121. *See generally* 16 Am. Jur. 2d at sec. 16. Our state constitution functions this way and restrains these general powers by a Declaration of Rights. We have refused to apply the doctrine of *expressio unius est exclusio alterius* "'where the result will be to limit the plenary power of the legislature by implication.'" *Quinn v. Town of Dodgeville,* 122 Wis. 2d 570, 583, 364 N.W.2d 149 (1985) *quoting Ferguson v. Kenosha,* 5 Wis. 2d 556, 564–65, 93 N.W.2d 560 (1958). The legislature, therefore, has plenary power to legislate all laws not forbidden by the state constitution.

This court has previously recognized that our Declaration of Rights establishes limitations or restrictions on state action. Section 1 of the Declaration of Rights contains no reference to laws or express limitations on state action.[3] However, in *State ex rel. Zillmer v. Kreutzberg,* 114 Wis. 530, 532, 90 N.W. 1098, 1099 (1902), this court stated: "At this late date it cannot be doubted that this declaration of the purpose to be accomplished is to be construed as a limitation upon the powers given." *See also Pauly v. Keebler,* 175 Wis. 428, 430–31, 185 N.W. 554, 556 (1921) (Art. I, sec. 1 is a "limitation of legislative power"); *State v. Redmon,* 134 Wis. 89, 101, 114 N.W. 137, 138 (1907) (Art. I, sec. 1 contains a "broad general restriction of legislative power"); *Nunnemacher v. State,* 129 Wis. 190, 230, 108 N.W. 627, 640 (1906) (Dodge, J., dissent-

---

[3] Article I, sec. 1 of the Declaration of Rights, Wisconsin Constitution, provides as follows:

"All people are born equally free and independent, and have certain inherent rights; among these are life, liberty and the pursuit of happiness; to secure these rights, governments are instituted, deriving their just powers from the consent of the governed."

ing on another ground) (Art. I, sec. 1 is a "limitation upon the powers delegated to the government"); *State ex rel. Kellogg v. Currens,* 111 Wis. 431, 434–35, 87 N.W. 561, 562 (1901) (Art. I, sec. 1 imposes a "limitation" on the legislature).

Neither does sec. 9 of the Declaration of Rights contain reference to laws or express limitation on state action.[4] Nevertheless, in *Durkee v. City of Janesville,* 28 Wis. 464, 469–71 (1871), this court held that sec. 9 is a limitation upon the power of the state to discriminate between the rights of different parties to the same litigation. *See also City of Janesville v. Carpenter,* 77 Wis. 288, 301, 46 N.W. 128, 132 (1980)(statute taking property without compensation or due process and denying person equal protection violated Art. I, secs. 9 and 13); *Hincks v. City of Milwaukee,* 46 Wis. 559, 566, 1 N.W. 230, 232 (1879)(Art. I sec. 9 invalidates legislative immunity granted to one municipality but not to others).

In *State ex rel. Milwaukee Medical College v. Chittenden,* 127 Wis. 468, 521, 107 N.W. 500, 517–18 (1906), the court characterized Art. I, sec. 22[5] of the

---

[4]Art. I, sec. 9 of the Declaration of Rights, Wisconsin Constitution provides as follows:

"Every person is entitled to a certain remedy in the laws for all injuries, or wrongs which he may receive in his person, property, or character; he ought to obtain justice freely, and without being obliged to purchase it, completely and without denial, promptly and without delay, conformably to the laws."

[5]Art. I, sec. 22 of the Wisconsin Constitution provides as follows:

"**Maintenance of free government.** SECTION 22. The blessings of a free government can only be maintained by a firm adherence to justice, moderation, temperance, frugality and virtue, and by frequent recurrence to fundamental principles."

Wisconsin Constitution as any "implied inhibition" against governmental action with which any legislative scheme must be in compliance.

In *State ex rel. McGrael v. Phelps*, 144 Wis. 1, 15, 128 N.W. 1041, 1046 (1910), this court held that Wisconsin's Declaration of Rights "constitute[s] inhibitions of legislative interference by implication, and with quite as much efficiency as would express limitations, as this court has often held."

This court has decided cases supporting the principle that our Declaration of Rights does not protect private persons from private interference. In *Barry v. Order of Catholic Knights*, 119 Wis. 362, 366, 96 N.W. 797 (1903), a widow sued on a death benefit certificate issued by a Roman Catholic Association from which her husband had been expelled due to their marriage. She contended that provisions in the association's constitution and bylaws that require members to be "practical Catholics" violated sec. 18 of the Declaration of Rights of the Wisconsin Constitution.[6] This court rejected the position that sec. 18 is protection from private conduct.

In *In re Paulson's Will*, 127 Wis. 612, 618, 107 N.W. 484, 486–87 (1906), this court rejected the argument that a condition in a will of a mother that

---

[6]Article I, sec. 18 of the Declaration of Rights of the Wisconsin Constitution provides as follows:

"The right of every person to worship Almighty God according to the dictates of conscience shall never be infringed; nor shall any person be compelled to attend, erect or support any place of worship, or to maintain any ministry, without consent; nor shall any control of, or interference with, the rights of conscience be permitted, or any preference be given by law to any religious establishments or modes of worship; nor shall any money be drawn from the treasury for the benefit of religious societies, or religious or theological seminaries."

bequeathed annual payments to her son only if he attended a named church was a violation of sec. 18.

In *State ex rel. Dame v. LeFevre,* 251 Wis. 146, 152, 28 N.W. 2d 349 (1947), this court rejected a claim that a union member could not be expelled from that organization without due process of law. The court stated: "The due-process clauses of the state and federal constitutions are not applicable to contract relationships between individuals."

*Ware v. State,* 201 Wis. 425, 426, 230 N.W. 80 (1930), held that sec. 11 of the Declaration of Rights protects persons against unreasonable searches and seizures conducted by the state.[7] The court held that defendant's diary was admissible in evidence against her when her former husband had taken a key from her purse, unlocked the chest in which the diary was kept and delivered it to the prosecution. There was no constitutional protection except for unreasonable searches and seizures by the state. *See also Potman v. State,* 259 Wis. 234, 239–40, 47 N.W.2d 884, 886–87 (1951) (search by private persons without defendant's consent does not violate sec. 11).

Article I, sec. 2 of the Wisconsin Constitution[8] prohibits slavery in this state. The concur-

---

[7]Article I, sec. 11 of the Declaration of Rights of the Wisconsin Constitution provides as follows:

"The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures shall not be violated; and no warrant shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized."

[8]Article I, sec. 2 of the Wisconsin Constitution provides:

"**Slavery prohibited.** Section 2. There shall be neither slavery, nor involuntary servitude in this state, otherwise than for

rence/dissent argues this is evidence that the Bill of Rights was not intended only to protect rights against state interference. However, there is a difference between a right of free speech under Art. I, sec. 3 and a prohibition under Art. I, sec. 2. The prohibition against slavery is all inclusive, state or persons, and is different than a freedom granted by the constitution protected from governmental interference. It would be illogical and without any substance to find the state may not interfere with a prohibition. Article I, sec. 2 prohibits not only persons from owning other persons as property, but also prohibits the state from adopting statutes that would make ownership of persons legal. The state is not enjoined from interfering with an individual right by Art. I, sec. 2 because that section denies the existence of ownership of persons as a right. It is not the prohibition of state interference as to a right, but rather the denial of the existence of any such right. This is consistent with the prohibition against slavery in Article VI of the Northwest Ordinance of 1787 from which the territory of Wisconsin was formed as a state.[9]

We do not accept the proposition that a negative restraint on government creates a positive right

the punishment of crime, whereof the party shall have been duly convicted."

[9]Article VI of the Northwest Ordinance of 1787 states:

"Art. VI. There shall be neither slavery nor involuntary servitude in the said territory, otherwise than in the punishment of crimes, whereof the party shall have been duly convicted: *Provided always,* that any person escaping into the same, from whom labor or service is lawfully claimed in any one of the original States, such fugitive may be lawfully reclaimed, and conveyed to the person claiming his or her labor or service as aforesaid."

assertable against all other persons. The historical intention of state constitutions, including Wisconsin's, was a reaction to the dire experience with England to recognize rights of the people and protect them from governmental interference. Governments were not to be trusted, but rather were controlled by Declarations of Rights from any interference with those rights. This does not mean that these rights needed protection from interference by other persons. To turn what was prohibition of governmental acts into positive rights against other private persons is not logical nor historically established. In fact, it would be contrary to history. Courts would be ill-advised to rewrite history and plain, clear constitutional language to create some new rights contrary to history. To do this courts would become mini-constitutional conventions in individual court cases whenever a new theory or philosophy became appealing. To say that whenever a balancing must be done between free speech and private interests that free speech must prevail is to give vent to one's own choices and to rewrite history and the constitution in personal terms. That is not the right nor privilege of courts or judges.

In *In Matter of Guardianship of Eberhardy,* 102 Wis. 2d 539, 571, 307 N.W.2d 881 (1981), we stated:

> "Although Benjamin Cardozo was considered a judicial activist and believed it important for courts to blaze trails where necessary to protect human rights, nevertheless he said:
> "'The judge, even when he is free, is still not wholly free. He is not to innovate at pleasure. He is not a knight-errant, roaming at will in pursuit of his own ideal of beauty or of goodness. He is to draw his inspiration from consecrated principles. He is not to yield to spasmodic sentiment, to vague

and unregulated benevolence. He is to exercise a discretion informed by tradition methodized by analogy, disciplined by system, and subordinated to "the primordial necessity of order in the social life." Wide enough in all conscience is the field of discretion that remains.' Cardozo, *The Method of Sociology. The Judge as a Legislator,* The Nature of the Judicial Process, p. 141."

To hold that a specific provision in the Declaration of Rights grants rights to persons enforceable against other private persons proposes a new direction. The proposal would work a change from protecting rights from government action to granting rights to every person enforceable against all other persons.

A review of our cases demonstrates that in our Declaration of Rights there is a presumption that a specific provision in the Declaration is intended to protect persons only from state action unless strong evidence exists to the contrary. The language of Judge Gartzke in his concurring opinion is clear and accurate:

> "When constitution makers can be found, as here, to have had an intention consistent with a prevailing concept of government, but we are urged to find that they intended an additional theory, it is fair to force proponents of the new theory to prove that it also was intended." *Jacobs v. Major,* 132 Wis. 2d at 137.

There has been no such showing here.

The presumption applies at every level when interpreting the Declaration of Rights, since the aim of constitutional analysis is to find the meaning

intended by the framers. *State ex rel. Zimmerman v. Dammann,* 201 Wis. 84, 88–89, 228 N.W. 593, 595 (1930). This is true regardless of what stage of the interpretative analysis is considered pursuant to *Beno,* unless the language is plain, clear and capable of only one meaning.

The case of *Robins v. PruneYard Shopping Center,* 23 Cal. 3d 899, 592 P.2d 341, 153 Cal. Rptr. 854 (1979) was the precursor California Supreme Court decision which was appealed to the United States Supreme Court. With language similar to Art. I, sec. 3 of the Wisconsin Constitution, but not identical, the California Constitution at Art. I, sec. 2 reads:

> "Every person may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of this right. A law may not restrain or abridge liberty of speech or press."

The California court, in a 4–3 decision, stated that the "public interest in peaceful speech outweighs the desire of property owners for control over their property." *PruneYard,* 23 Cal. 3d at 909, 592 P.2d at 347, 153 Cal. Rptr. at 860. The majority continued to state: "We conclude that sections 2 and 3 of article I of the California Constitution protect speech and petitioning, reasonably exercised, in shopping centers even when the centers are privately owned." *Id.* at 910. It is significant that the majority did not analyze the constitutional sections, but rather summarily stated the protections granted by those sections. It appears to be more a decision of desire rather than analytical conviction. As the dissent in the state *PruneYard* case points out, the majority ignored entirely findings of fact and conclusions of law of the

trial court which would effect a contrary result by the majority.

However, the majority opinion relied heavily on another provision of the California Constitution, Art. I, sec. 3 which provides that "people have the right to ... petition government for redress of grievances ...." This provision was held vital to a basic process in the state's constitutional scheme—direct initiation of change by the citizenry through initiative, referendum, and recall. (Cal. Const. Art. II, secs. 8, 9 and 13.) The court drew a distinction between a mall and other privately owned property. Therefore, the constitutional language was interpreted to have different meaning and effect depending on the property invaded by free speech to petition the government. The relevant statement was:

> "It bears repeated emphasis that we do not have under consideration the property or privacy rights of an individual homeowner or the proprietor of a modest retail establishment." *Id.* at 911, 592 P.2d 347, 153 Cal. Rptr. 860.

An earlier California case rejected in *Prune Yard* was *Diamond v. Bland,* 11 Cal. 3d 331, 521 P.2d 460, 113 Cal. Rptr. 468 (*Diamond II*) (1974). There the court stated it refused to adopt an interpretation of a constitutional provision only to apply to select persons in society but not others. Constitutional interpretation cannot depend on the social result sought as to some but not all.

In *Cologne v. Westfarms Associates,* 192 Conn. 48, 60, 469 A.2d 1201, 1207 (1984), the Connecticut Supreme Court held:

> "The history of the adoption of our Connecticut bill of rights indicates that it was a response to the

prevailing political sentiment of that time that the basic liberties of the people should be enshrined in a written constitution to ensure their protection from governmental infringement."

That court further elaborated as follows:

"This court has never viewed constitutional language as newly descended from the firmament like fresh fallen snow upon which jurists may trace out their individual notions of public policy, uninhibited by the history which attended the adoption of the particular phraseology at issue and intentions of its authors. The faith which democratic societies repose in the written document as a shield against the arbitrary exercise of governmental power would be illusory if those vested with the responsibility for construing and applying disputed provisions were free to stray from the purposes of the originators. 'If the words have a doubtful meaning, or are susceptible of two meanings, they should receive that which will effectuate the intent of the framers of the Constitution and the general intent of the instrument.' *Borino v. Lounsbury*, 86 Conn. 622, 625, 86 A. 597 (1913)." *Id.* at 62, 469 A.2d at 1208.

Sections 4 and 5 of the Connecticut Bill of Rights are similar to Wisconsin's Art. I. sec. 3.

The Court of Appeals of New York in *Shad Alliance v. Smith Haven Mall,* 66 N.Y.2d 496, 502–03, 488 N.E.2d 1211, 1215 (1985), held:

"That a Bill of Rights is designed to protect individual rights against the government is standard constitutional doctrine [citations omitted] and, while the drafters of the 1821 free speech clause may not have envisioned shopping malls, there can be no question that they intended the

state constitution to govern the rights of citizens with respect to their government and not the rights of private individuals against private individuals."

New York's Constitution Article I, sec. 8 is identical to Wisconsin's Art. I, sec. 3. The New York court went on to state:

"Abrogation of a State action requirement, as urged here by plaintiffs, would have broad and mischievous consequences because it would signify 'a determination by the court that it, instead of the legislature, will settle conflicting interests among citizens and that it will accomplish this by what it chooses to call a constitutional basis' [citation omitted] which is then beyond legislative reach. A disciplined perception of the proper role of the judiciary, and, more specifically, discernment of the reach of the mandates of our State constitution, precludes us from casting aside so fundamental a concept as State action in an effort to achieve what the dissent perceives as a more socially desirable result." *Id.* at 505, 488 N.E.2d at 1217.

In addition to the state *PruneYard* case, another case with a contrary result to our decision is *Alderwood Assoc. v. Wash. Envir. Council,* 96 Wash. 230, 635 P.2d 108 (1981). The plurality opinion relied on *PruneYard* as written by the California Supreme Court.[10] Stress was placed in this case also on the fact

---

[10]In *Alderwood,* Justice Utter wrote the plurality opinion. Justices Rossellini, Williams and Dore joined it.

Justice Dolliver agreed with the result of the plurality opinion (allowing the gathering of signatures) but based his concurrence on a section of the Washington Constitution that specifically dealt with public initiatives, not on freedom of speech grounds. Justice

that a large shopping mall was involved. The plurality opinion stated, referring to the state *PruneYard* case: "The court stressed, however, that had the case involved the proprietor of a modest retail establishment or an individual homeowner, a different result might have been reached." *Id.* at 236, 635 P.2d at 112. We fail to see how the size of a private identity against whom the action is directed can determine the clear meaning of the constitutional provision which should be subject to a common interpretation and application. The same author in *Alderwood* wrote: "The law is not a static concept and it expands to meet the changing conditions of modern life." *Id.* at 238, 635 P.2d at 113. To change the meaning of clear wording of a constitutional provision due to changing conditions of life is to give it an interpretation with no lasting quality, but rather a meaning dependent on the vote of four persons on this court. It does not even have the quality of a statute much less a constitutional provision with that approach. The demographics of society do not change the meaning of unambiguous language of a constitution. Constitutional amendments must be sought to change the meaning of a constitutional provision to apply to modern conditions, if that is desired. Otherwise, the application may be changed but not the clear meaning. The

Dolliver specifically rejected free speech as a basis for allowing the result.

Justice Stafford wrote the dissent. Justices Brachtenbach, Hicks and Dimmick joined the dissent.

The vote was therefore 4–1–4. While five justices found that the behavior should be allowed, five justices also found that there was no constitutional right to free speech on private property in the Washington Constitution. Only four justices found the constitution required free speech on private property.

judiciary should not set itself up as a continuing constitutional convention with the law being determined sociologically rather than jurisprudentially.

The Washington court also relied on that state's constitutional provision of the power of initiative in amendment 7.[11] Wisconsin does not have the provision for initiative. The author of the plurality opinion stated: "[W]e choose to follow the approach of *Schmid* and *Robins* which recognizes that the 'state action' analysis of the Fourteenth Amendment is required by the language of the federal, but not the state, constitution." *Id.* at 293, 635 P.2d at 115–16. This is not a judicial prerogative and expresses a legislative rather than judicial discipline. To state as that opinion did that: "The law is not a static concept and it expands to meet the changing conditions of modern life" begs the issue of words of clear meaning in a constitution and gives vent to the philosophies of any temporary majority or plurality of an appellate court with no predictability in law of an otherwise enduring document.

In the *Alderwood* case, the concurring opinion added to the plurality decision making it a majority result, and the law of the case only. This concurring opinion was not based on preferring freedom of speech over private property. The concurring opinion accused the plurality opinion of "constitution-making by the judiciary of the most egregious sort. ... There is nothing in our constitution, in our constitutional

[11]Amendment 7 to the Washington Constitution struck and replaced all of Article II of that constitution. Article II, sec. 1(a) relied on by the *Alderwood* court states in part: "The first power reserved by the people is the initiative." The plaintiff in *Alderwood* was involved in an initiative drive for signatures to change a law.

519

history, in the opinions of this court or in the writings of commentators on our constitution which gives credence to the position of the majority." *Id.* at 248–50, 635 P.2d at 118–19. Also, the concurring opinion stated: "Now there is no limit to the range of wrongs which this court may right—subject only to the court's notion of balancing interests." *Id.* at 250–51. Finally, the opinion stated: "Today, the term 'imperial judiciary' takes on new meaning. *See* N. Glazer, *Towards an Imperial Judiciary?*, 41 The Public Interest 104 (Fall, 1975)." *Id.* at 251, 635 P.2d at 120.

This court has the power, perhaps the duty, to make sure that the protections of our state constitution remain relevant in light of changing conditions, emerging needs and acceptable changes in social values, but such action must be consistent with the clear meaning of the constitution. However, this cannot be "made an excuse for imposing the individual beliefs and philosophies of the judges upon other branches of government," for this "shackles progress, and breeds distrust and suspicion of the courts." Cardozo, Nature of the Judicial Process, at 91. Our constitution defines and limits the powers of state government; it is not a license for the judiciary to convert what the judiciary perceives to be desirable social policies into constitutional law. *See,* Berger, *The Supreme Court as a Legislature; A Dissent,* 64 Cornell L. Rev. 988 (1979); Deukmejian and Thompson, *All Sail and No Anchor—Judicial Review Under the California Constitution,* 6 Hast. Const. L.Q. 975 (1978–79); Thayer, *Origin and Scope of American Doctrine of Constitutional Law,* 7 Harv. L. Rev. 129, 135 (1893–94).

It is not the role of this court to set exact balances between the temporal and changing interests of

conflicting private groups which then become inflexible as chiseled in the marble tablets of constitutional adjudication. Balancing between competing or conflicting interests is better conducted by the legislature, as long as within the constitutional limitations against governmental interference with private rights.

Other courts have arrived at the same conclusions regarding their states' Bill of Rights protecting against state interference and not protecting against other private persons or interests. They agree with our analysis of the history of such Bill of Rights and their purposes as shown by the intent of their authors and framers.

It is significant that Wisconsin does not have a provision in our constitution parallel to Michigan's right to initiative to propose, enact and reject laws.[12] Notwithstanding the Michigan constitutional provision, in *Woodland v. Michigan Citizens Lobby,* 423 Mich. 188, 215, 378 N.W.2d 337, 349 (1985), the Michigan Supreme Court held that the Declaration of Rights, Art. I, sec. 5 which reads identical to our Art. I, sec. 3: "[E]ven under the most liberal interpretation, this provision cannot be construed as conferring a right to be exercised by one private individual or entity against another." The Michigan court further held:

> "[W]e cannot in judicial conscience reinterpret our state constitution in a way that is contradictory to its fundamental purposes, its history, the intentions of its authors, the past decisions of this Court, and, most importantly, the understanding with

---

[12] Michigan Constitution adopted in 1963, Art.II, sec. 9.

521

which it was adopted by the people of this state."
*Id.* at 235, 378 N.W.2d 358.

The argument is made that this is a case where the malls have replaced the downtown small town square for purposes of public demonstration. There cannot be any serious claim that the Madison community in which the Capital and state government are located, as well as the largest part of the state university system, does not provide public areas for free expression. Nor is this a case of the company town with a resemblance to governmental organization and control over the functions in society. In *Marsh v. Alabama,* 326 U.S. 501, 505 (1946) there was a company town involved and the issue was:

"Can those people who live in or come to Chickasaw be denied freedom of press and religion simply because a single company has legal title to all the town? For it is the State's contention that the mere fact that all the property interests in the town are held by a single company is enough to give that company power, enforceable by a state statute, to abridge these freedoms."

The Court held:

"In our view the circumstance that the property rights to the premises where the deprivation of liberty, here involved, took place, were held by others than the public, is not sufficient to justify the State's permitting a corporation to govern a community of citizens so as to restrict their fundamental liberties and the enforcement of such restraint by the application of a state statute. Insofar as the State has attempted to impose criminal punishment on appellant for undertaking

to distribute religious literature in a company town, its action cannot stand." *Id.* at 509.

Thus, it was the state's attempted action in controlling and stifling constitutional rights on private property that was prohibited conduct. In *Marsh,* therefore, the constitutional problem existed because the state had allowed a corporation that was indistinguishable from a municipality to enforce regulations that a municipality could never enforce. It cannot be said that the malls in the present case resemble a municipality. There are no residential areas, only business areas and businesses of a retail nature. For many hours of the day, the entire mall is closed and the public is not admitted. The entire environment of the mall is controlled, heated in the winter, air conditioned in the summer, with central music piped in. This is all done to encourage commercial patronage. The parking areas around the malls are arranged so that the adjoining streets provide access to the mall, and therefore the only purpose of parking in the mall parking lot is to facilitate shopping.

From the way the mall is arranged and operated, the mall is much more like the old-fashioned department store than a municipality. It concerns itself only with one facet of its patrons' lives—how they spend their money.

The company town in *Marsh* performed all the functions of a municipality. Separate areas were set aside for residences and business. As such, the community was self-supporting. The residents did not need to leave unless they wanted to. Therefore, the only way to communicate with the citizens was on the "public" street.

The *Marsh* Court analogized between the streets and sidewalks and privately owned bridges, ferries, turnpikes and railroads, because these facilities are "built and operated to benefit the public and their operation is essentially a public function," and therefore "subject to state regulation." *Id.* at 506.

It is clear that the malls in this action could not be said to have an essentially public function. Malls, shopping centers, department stores, and specialty stores exist for primarily one function: profit for their owners. The public nature of their business is a byproduct, as the public wants to examine the merchandise it purchases. The mall has no attraction by itself without its stores. Since the mall has no public function as the city streets and sidewalks had in *Marsh,* the relief granted in *Marsh* is not appropriate here.

It should be noted that the Court in *Marsh* opened only the streets and sidewalks of the company town for the distribution of literature. Opening the mall "avenues" would be like opening the private businesses in the *Marsh* community. Since neither has an essentially public nature, we cannot hold them subject to the same constitutional requirements with which public property must comply.[13]

After an analysis of the Wisconsin Constitution, John Sundquist in *Construction of the Wisconsin*

[13]The concurrence/dissent refers to former Chief Justice Beilfuss's majority opinion in the court of appeals; however, the concurrence/dissent ignores his statement that: "[T]he malls' primary use here is in no sense the functional equivalent of public sidewalks or the traditional town square." 132 Wis. 2d at 109. (Footnote omitted.)

*Constitution—Recurrence to Fundamental Principles,*
62 Marq. L. Rev. 531, 547 (1979) stated:

> "Because a state constitution, unlike the federal
> constitution, is designed to limit the powers of the
> departments of state government, each of its
> provisions are presumed to be mandatory rather
> than merely directory."

*State v. Schmid,* 84 N.J. 535, 544, 423 A.2d 615,
619 (1980), involved the act of distributing political
materials on the main campus of Princeton Universi-
ty, a private, non-profit institution of higher educa-
tion. The university regulations required permission
for the on-campus distribution of materials by off-
campus organizations. Defendant was convicted of
trespass for distributing prohibited materials. The
New Jersey Supreme Court found:

> "In particular settings, private entities, including
> educational institutions, may so impact upon the
> public or share enough of the essential features of
> governmental bodies as to be engaged functionally
> in 'state action' for First Amendment purposes."

That court then found the New Jersey constitu-
tional provision at Art. I, par. 6[14] applied and stated:

> "[T]he test to be applied to ascertain the parame-
> ters of the rights of speech and assembly upon
> privately-owned property and the extent to which
> such property reasonably can be restricted to

---

[14]Art. I, par. 6, New Jersey Constitution (1947) provides as
follows:

"Every person may freely speak, write and publish his
sentiments on all subjects being responsible for the abuse of that
right. No law shall be passed to restrain or abridge the liberty of
speech or of the press...."

accommodate these rights involves several elements. This standard must take into account (1) the nature, purposes, and primary use of such private property, generally its 'normal' use, (2) the extent and nature of the public's invitation to use the property, and (3) the purpose of the expressional activity undertaken upon such property in relation to both the private and public use of the property." *Id.* at 563, 423 A.2d 630.

These tests do not apply in Wisconsin since we hold by the clear and unambiguous meaning of Art. I, sec. 3 of this state's constitution that the right of free speech applies against state not private action. The *Schmid* rationale was rejected by the Supreme Courts of Connecticut, New York and Michigan.

The defendants argue there are inherent rights coming from God or nature which existed, therefore, prior to the very idea of a Wisconsin Declaration of Rights or a Wisconsin state government. They argue that in a governmentless society, such as Wisconsin was during the earliest days of colonial exploration, persons still possessed meaningful rights by virtue of the laws of God and nature. Defendants then come to the conclusion that if such rights have any meaning, they must apply as against one's fellow human beings. This they say is true since a right which, because it is inherent, exists prior to the institution of any government, cannot shrink or disappear when a government is established, but retains its full moral vigor and validity in nongovernmental as well as governmental contexts. Thus, the argument goes that though Wisconsin adopted a constitution, the inherent rights, free speech being one, exist as between private persons. Carrying this to its logical conclusion produces the

absurd result that the right can be exercised on any property including private property.

In a later argument, defendants would accept certain necessary limitations to the exercise of free speech such as, place, time and manner on commercial property to protect those legitimate commercial interests. This concession is not consistent with their argument concerning inherent rights which are given by God and nature. They would have the courts determine the reasonable limits on the rights by balancing with an uncertain test between the inherent personal rights and the rights of property. We find this to be an argument without persuasion and if adopted, would give rise to uncertainties to be resolved by courts sitting as de facto constitutional conventions.

Another argument without historical substantiation is that the understanding of the people of Wisconsin was without doubt that the state constitution set forth not only specific guarantees against governmental actions but inherent rights good not only against the government, but against any invasion from any source. There is no persuasive showing that was the understanding of the people of Wisconsin when the Bill of Rights was adopted.

The defendants base their determination that Art. I, sec. 3 is not a guarantee against state action only on the contention that an inherent right must be good against private interests as well as the government, and that the statement of such a right in an instrument creating a government for the purpose of securing the right must be as broad as the inherent right itself. We believe that position to be too broad and not convincing unless stated with more specifici-

ty, since it is not consistent with the plain language of Art. I, sec. 3. We do not accept the position that state action is present since the plaintiffs sought justice through the courts, nor would it be state action to call upon the police to enforce the law.

■ Discussion concerning the non-obtrusive nature of defendants' activities, the need for channels of communication, which already exist at many locations, and the historical and rich tradition of free expression in Wisconsin does nothing to resolve the question in this case. Such factors are not relevant to the clear meaning of the words of the constitutional section and as to whether state action is present and whether there has been a constitutional infringement. Since there is no state action involved, the provisions of the Wisconsin Constitution have no role in the resolution of a dispute between these private parties.

It is apparent from the concurring/dissenting opinions in this case and in *State v. Horn,* 139 Wis. 2d 473, 407 N.W.2d 854, filed this same date, that the size and use of the property involved would determine the application of Art. I, sec. 3 under the tests proposed by the concurrences/dissents. We do not believe the framers had such distinctions in mind with the clear and unambiguous language used. We reject the contention that we are rewriting Art. I, sec. 3 as adopted by the framers of the constitution. We are simply applying the clear and unambiguous language they adopted.

■ Since we have concluded that the Nu Parable dancers had no constitutional right to dance on the plaintiffs' property, we must examine whether the trial court erred by refusing to award damages for the

single dance that did take place. The trial court issued a temporary injunction before the Nu Parable dancers actually danced at East Towne. Subsequent to that dance, the trial court found the Nu Parable dancers violated the temporary injunction, granted a permanent injunction and denied the East Towne Mall damages. The permanent injunction was limited to enjoining the defendants from "performing in any way upon plaintiffs' property." On this record it was error and an abuse of discretion for the trial court to limit the effectiveness of this permanent injunction; rather, it should have enjoined all non-consensual use. The court of appeals decision to affirm the limited injunction was also error and is modified.

Initially, East Towne management denied the Nu Parable dancers permission to enter the mall for the purpose of dancing. However, Nu Parable dance members were permitted in the mall provided that they use the shopping mall only to shop, not to leaflet or dance. Therefore, any violation of this conditional permission would constitute a trespass. While the issuance of the temporary injunction strengthened the nature of the notice by adding criminal contempt of court sanctions, East Towne management's cause of action was still for trespass.

It is clear from the actions of the trial court (finding of contempt) that the Nu Parable members committed a trespass consisting of non-consensual use of the private property. The violation of the injunction is only relevant because it makes such a conclusion clear as a matter of law. If East Towne would have failed to get an injunction, it would still have had an action for trespass that would have survived a motion for summary judgment; the finder of fact would have

to determine what the scope of the permission was and whether the actions of the dancers or distributing leaflets violated that permission. The injunction and contempt proceedings provide the answer to both of these issues.

When an action for trespass is brought and trespass is found by the finder of fact, the plaintiff is entitled to at least nominal damages for the vindication and protection of his right, even if the trespass actually adds value to the property. *Murphy v. City of Fond du Lac*, 23 Wis. 365 (1868). The trial court here concluded that the temporary injunction was violated; the injunction expressed the terms of the permission to enter the land. Therefore, a trespass occurred. In *Murphy*, the supreme court stated that nominal damages are always appropriate for a trespass but beyond that if shown compensatory damages may be given. *Id.* at 366. *See also, Drummond v. City of Eau Claire*, 85 Wis. 2d 556, 563 (1893); *Benson v. Village of Waukesha*, 74 Wis. 31, 39 (1889). The trial court did not consider awarding damages and this was an abuse of discretion also.

It is not the province of this court to determine the amount of the damages; that is the responsibility of the finder of fact. However, we note evidence was presented before the trial court from which that court could conclude that actual, rather than nominal damages, occurred as the result of this trespass.

We hold Article I, sec. 3 of the Wisconsin Constitution did not protect the defendants' conduct on plaintiffs' property since state action was not involved. We further hold that the Nu Parable dancers performed without the permission of the owners of the property and were therefore trespassers. We remand

the case to the circuit court for a finding of damages not inconsistent with this opinion.

*By the Court.*—The decision of the court of appeals is modified and as modified affirmed in part and reversed in part.

SHIRLEY S. ABRAHAMSON, J. *(concurring in part, dissenting in part).* The primary issue in this case is whether the exclusion from a "public forum" of members of the public who wish to engage in political speech violates the right to speak freely guaranteed by the Wisconsin Constitution, where a nongovernmental entity owns and operates the "public forum" and imposes the exclusion. I conclude that the Wisconsin Constitution protects political speech reasonably exercised in a nongovernmental "public forum" from unreasonable interference by the owners.[1]

*Free Speech and the Public Forum.* As Judge Bruce Beilfuss (former Chief Justice of this court), writing for the court of appeals in this case, pointed out, "[F]ree expression is one of society's most crucial civil liberties." *Jacobs v. Major,* 132 Wis. 2d 82, 91, 390 N.W.2d 86 (Ct. App. 1986). The right to speak freely is essential to nourish democracy. "Those who won our independence believed that ... the greatest menace to freedom is an inert people; that public discussion is a political duty; and that this should be a fundamental

---

[1]As we explain later, nongovernmental owners of "public forums" have the right to restrict expressive conduct on their property. Indeed, government has the right to place certain restrictions on expressive conduct on property it owns. For a discussion of the permissible and impermissible restrictions by government, see, *e.g., Perry Ed. Ass'n v. Perry Local Educators' Ass'n,* 460 U.S. 37, 45 (1983); *Board of Airport Comm'r v. Jews for Jesus* (No. 86–104), — U.S. — (June 15, 1987).

principle of the American government." *Whitney v. California,* 274 U.S. 357, 375 (1927) (Brandeis, J., concurring).

The right to speak freely would mean little if it were a right to speak only where one could not be heard. For that reason, the United States Supreme Court has held that the federal Constitution protects to some degree the access of speakers to public areas where the community gathers, areas known in first amendment parlance as "public forums." Although public forum is difficult to define, public streets, parks, or village squares—places which by long tradition or by government fiat have been devoted to assembly and discussion—fall into this category. "Wherever the title of streets and parks may rest, they have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions. Such use of the streets and public places has, from ancient times, been a part of privileges, immunities, rights and liberties of citizens." *Hague v. CIO,* 307 U.S. 496, 515 (1939) (Roberts, J., concurring). The public forum is an inexpensive and accessible means of public communication.

Traditionally, the government provided the centers for community gatherings that constituted public forums. Increasingly, however, certain nongovernmental entities have taken over the role the government formerly played by providing areas that are used for public gatherings. The more than 25,000 shopping centers in the United States, for example, have been described as "new downtowns," where people not only shop but also stroll, socialize and participate in

community activities as they once did in downtown business districts.

The mall in this case, East Towne, is an example of this trend.[2] Envisioned as a "community center" ("a focal point for civic activities") and advertised as such, the East Towne mall provides interior corridor space of about 83,000 square feet and accommodates an estimated 175,000 visitors per week. The mall is open to the public, and people need not have a commercial purpose to enter. The management permits a great deal of community activity in the mall—e.g., musical events, automobile shows, and public service events and exhibits—but prohibits, among other things, political or religious activities of any kind. The management's prohibition on political expression in the mall extends even to the carrying of balloons with political messages written on them.

The management of the mall, then, exercises an enormous power when it denies political speakers access to such a center of community life, a power analogous to that of the government as provider of public forums.[3]

*First Amendment.* The first amendment to the federal Constitution (as made applicable to the states by the fourteenth amendment) provides, "Congress shall make no law ... abridging the freedom of speech." The United States Supreme Court has said that prohibitions on political speech in nongovernmentally-owned shopping malls do not violate the first

---

[2] The other mall in this case, West Towne, is essentially the same as East Towne, although it is somewhat smaller.

[3] The "public forum" concept used here in connection with nongovernmental entities under the state constitutional provision draws on but is not necessarily the same as the "public forum" concept under the federal Constitution.

amendment as applied to the states through the fourteenth amendment. The first amendment restrains only state action. *Lloyd Corp v. Tanner,* 407 U.S. 551 (1972).

*Art. I, sec. 3, Wisconsin Constitution.* This court has recognized that our state constitution may permit greater freedom of speech than the federal Constitution. See *McCauley v. Tropic of Cancer,* 20 Wis. 2d 134, 139, 121 N.W.2d 545 (1963). Our state constitutional convention considered a provision very similar to the first amendment, but rejected it as too indefinite.[4] Instead, the people of the state of Wisconsin chose to frame the state constitutional right of free speech more broadly and more definitely than the first amendment. Judge Gartzke's concurring opinion in the court of appeals, *Jacobs v. Major,* 132 Wis. 2d 82, 140–143, 390 N.W.2d 86 (1986), describes the history of art. I, sec. 3 in the constitutional convention.

Art. I, sec. 3 of the Wisconsin Constitution provides: "Every person may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that right, and no laws shall be passed to restrain or abridge the liberty of speech or of the press...." Art. I, sec. 3 of the constitution has two clauses. Broadly and affirmatively stated, the first clause confirms the centrality of freedom of expression in our constitutional scheme. More narrowly drawn and directed specifically at governmental interference with free speech, the second clause identifies the government as the gravest threat to free speech at the time the provision was drafted.

---

[4]The proposal, which was rejected, read "The legislature shall make no law abridging the freedom of speech..." Quoted in *Jacobs v. Major,* 132 Wis. 2d at 142 (Gartzke, J., concurring).

The constitutional text appears to provide an affirmative right to free speech valid by its own terms against all the world, not just the state. People going to the polls in 1848 or today to adopt the words "every person may freely speak, write and publish his sentiments on all subjects" would think naturally enough that the words protect each person's right to speak freely against any true threat, regardless of whether the source of the threat was a governmental or nongovernmental entity.

Further evidence appears in the constitution that sec. 3 protects against nongovernmental action. The Preamble to the Wisconsin Constitution places securing the blessings of freedom first on the list of reasons for the establishment of the Wisconsin Constitution. The Declaration of Rights makes clear that one of the fundamental purposes of the establishment of government in Wisconsin was the protection of individual freedom.[5] The Declaration of Rights then proceeds to enumerate many of the liberties, including freedom of expression, which the government was instituted to secure. A people who thought of government as necessary to protect freedom must have thought that there were persons or entities other than government that could threaten freedom.

Protection of speech against nongovernmental interference is consistent with the intentions of the framers and the electors adopting sec. 3. Judge Robert

[5]Section 1 of the Wisconsin Declaration of Rights states, paraphrasing the United States Declaration of Independence (not the federal constitution): "All people are born equally free and independent, and have certain inherent rights; among these are life, liberty and the pursuit of happiness; to secure these rights, governments are instituted, deriving their just powers from the consent of the governed."

H. Bork, a distinguished proponent of the jurisprudence of original intent, has explained that, in order to be true to the original intent of the framers, the modern judge must apply the general principles on which the framers agreed to circumstances which the framers could not have dreamed of. "A judge who refuses to deal with unforeseen threats to an established constitutional value, and hence provides a crabbed interpretation that robs a provision of its full, fair, and reasonable meaning, fails in his judicial duty." Bork, *The Constitution, Original Intent, and Economic Rights,* 23 San Diego L. Rev. 823, 827 (1986). The specific threats which the framers anticipated may provide some insight into how the framers might apply the constitutional value to circumstances they could not have anticipated. Bork, Foreward to McDowell, *The Constitution and Contemporary Constitutional Theory,* p. x (1985).[6]

---

[6] "A major problem with the idea of original intention is that the Framers articulated their principles in light of the world they knew, a world very different in important respects from that in which judges must decide cases today. This means that a constitutional right, generally stated, was illustrated for them by a set of circumstances or dangers that time has changed. It is the modern judge's task to determine whether that right applies to circumstances that did not even exist in contemplation when the Framers acted. He cannot confine himself to the specifics they had in mind, for to do so would make rights dwindle when, for example, technology changed. In order to protect the freedoms the Framers envisaged, the judge must discern a principle in the applications the Framers thought of and then apply that principle to circumstances they did not foresee. This, surely, is what Lincoln meant when he said, as McDowell paraphrases him, that 'The constitutional jurisprudence of judicial statesmanship is not limited to the *meaning* of the principles of the Constitution but extends to the *objects* those principles are, in time, intended to achieve.' " Bork, Foreword to McDowell, *The Constitution and Contemporary Constitutional Theory,* p. x (1985).

This case illustrates Judge Bork's point. The framers of the Wisconsin Constitution identified in art. I, sec. 3 both a general principle in the first clause (the right to speak freely) and a specific threat in the second (government interference with that right). In the context of this case, the nongovernmental entities who own and operate regional shopping centers which are promoted as, and function as, community centers are providing "public forums" of a sort previously provided by the government. By restraining political speech in these new "public forums" and asserting a right to control and orchestrate speech in these new centers of community life, these nongovernmental entities present a threat analogous to the specific threat identified by the framers of the Wisconsin Constitution. To be true to the intent of the framers, this court should declare that the constitution protects the individual's right to political speech in "public forums" from interference by these nongovernmental entities.

All the evidence points toward the conclusion that the framers and electors intended the Wisconsin Constitution to protect political speech reasonably exercised from unreasonable interference by nongovernmental owners of a "public forum:" the broad and affirmative wording of art. I, sec. 3, the framers' rejection of a provision clearly limiting protection of speech from governmental interference only, and the clear and unequivocal statements in the constitution

---

One of the most difficult problems in interpreting a constitutional provision is stating a constitutional value or principle at a level of generality that is neither more nor less than the words of the text will fairly bear.

that a fundamental purpose of government is the protection of freedom.

This conclusion does not mean that the defendants' expressive rights are unlimited. They are not. The defendants' rights to political speech are limited by the mall owners' rights to use of their property. The mall owners have the right to adopt restrictions on expressive conduct on their property.[7] The court of appeals majority opinion provides an example of one way of balancing the rights of free speech and property. The court of appeals precluded expression which was disruptive or threatening to the health or safety of the patrons or which interfered with the commercial purpose of the mall.

*The Majority Opinion and art. I, sec. 3.* Despite the differences in the texts of the state and federal constitutions and despite the state constitutional convention's rejection of a provision that spoke only to prohibit governmental interference with speech, the majority concludes that art. I, sec. 3 is to be read like the first amendment and entails only a freedom from governmental interference with speech.

Instead of explaining why texts that are worded so differently should be interpreted similarly, the majority simply invokes the plain meaning rule. In other words, the majority is asserting that the plain meaning of the provision adopted by the convention is the same as the plain meaning of the provision rejected by the convention.

In addition, the majority's interpretation renders the first clause surplusage. The majority asserts that the first clause states the right and the second clause protects the right. Yet, the second clause standing

---

[7]See note 1 *supra.*

alone—the substantial equivalent of which was rejected by the convention as too indefinite—completely states the right found by the majority: a protection against governmental interference with speech. The majority cannot explain what the first clause adds to the second clause. The majority's invocation of the plain meaning rule strains credibility.

For no apparent reason, given that it found the provision to have plain meaning, the majority embarks on an extended discussion of the state action concept in regard to the entire Declaration of Rights. Of course, we are not asked to construe the entire Declaration of Rights in this case. Nevertheless, in dictum that dwarfs the rest of its opinion, the majority fabricates a presumption "that a specific provision in the Declaration is intended to protect persons only from state action unless strong evidence exists to the contrary." Opinion at 512.[8]

Ignoring the fact that a central objective of Wisconsin state government is the protection of individual rights, the majority narrows the scope of the entire Declaration of Rights through its categorical assertion that the rights declared therein are presumed to protect only against state action. The evidence the majority adduces to support this presumption consists largely of quotations from scholars and cases establishing the truism that the provisions of the Declaration of Rights restrain state action. I do not dispute this truism which the majority opinion takes pains to demonstrate. The issue in this case, however, is whether art. I, sec. 3 protects an individual's freedom of expression from certain forms of

---

[8]I conclude, although the majority does not, that the very words of art. I, sec. 3 granting every person the right to speak freely are strong evidence to rebut any such presumption.

nongovernmental interference as well as from governmental interference. The majority's attempt to stretch its truism, so that the truism answers the issue in this case, results in a logical fallacy, i.e., the majority reasons that because the Declaration of Rights is presumed to protect against state action, the Declaration of Rights can be presumed not to protect against nongovernmental action that does not amount to state action.

The majority's presumption is supported neither by the text of section 3 nor by traditional methods of interpretation. It also conflicts with other provisions of the constitution. Art. I, sec. 2, for instance, prohibits slavery, stating "there shall be neither slavery, nor involuntary servitude in this state...." This language, like that of sec. 3, is silent regarding its application to individuals or government. I do not think there is any dispute that sec. 2 applies to individuals, private entities and the state government. There is no principled way to distinguish between secs. 2 and 3 with respect to the state action limitation.

Even if I were to accept the majority's conclusion that the Declaration of Rights restrains only state action, I might be persuaded that the shopping mall in this case constitutes state action, for purposes of art. I, sec. 3. The contours of state action for purposes of the state constitution may differ from the state action concept developed under the federal Constitution, which must address federalism issues. In this case the mall owners' exclusion of political speech is arguably state action because the mall has the attributes of a "public forum."

*The Injunction and Damages.* I would affirm the unanimous decision of the court of appeals regarding the injunction. Thus, to the extent that the majority

opinion affirms the decision of the court of appeals, I agree with the decision of the majority. I do not, however, agree with the majority's conclusion that the circuit court erred in limiting the injunctive relief and that the defendants are guilty of trespass.

*Conclusion.* Individual rights are not the brain-child of the judiciary. The framers of the Wisconsin Constitution chose to protect individual rights in the very first article of the Wisconsin Constitution. The framers twice in the Wisconsin Constitution indicated that the protection of individual rights was a fundamental purpose of government, and it was the framers who exhorted posterity to frequently recur to fundamental principles in order to preserve the blessings of a free government. The framers were deeply committed to the protection of individual rights, as they were committed to establish a government which would function in the best interests of the people.

In discharging the difficult task of interpreting and applying the principles broadly articulated by the framers in the Declaration of Rights, this court should not categorically presume that the framers intended individual rights to be read more narrowly than they were written. The personal preference of the judge should no more be used to read rights out of the constitution than it should be used to read rights into the constitution.

For the reasons set forth, I do not join the majority opinion. I am authorized to state that CHIEF JUSTICE NATHAN S. HEFFERNAN and JUSTICE WILLIAM A. BABLITCH join this opinion.

WILLIAM A. BABLITCH, J.   (*concurring in part, dissenting in part*). Some fifty years after the adoption of the Bill of Rights to the United States Constitution,

citizens of Wisconsin gathered in Madison to draft a constitution. The framers had before them the language of the first amendment to the United States Constitution: "Congress shall make no law ... abridging the freedom of speech...." The framers were asked to consider nearly identical language for the Wisconsin Constitution: "The legislature shall make no law abridging the freedom of speech...." This language limiting the protection of free speech only to governmental action was rejected as being "too indefinite." M. Quaife, *The Convention of 1846* at 365 (1919). The majority today reinserts what the framers specifically considered and rejected, and then in all seriousness accuses those who disagree with them of rewriting the constitution.

The majority opinion goes far beyond what is necessary to protect private property rights, thereby greatly limiting Wisconsin citizens' rights of free speech. I join with Justice Abrahamson's conclusion that the Wisconsin Constitution protects the reasonable exercise of political speech in a nongovernmental public forum. That the Wisconsin Constitution can be interpreted so as to protect *both* private property interests as well as individual freedom of expression is amply demonstrated in the majority opinion of the court of appeals. The court of appeals enjoined the Nu Parable performance, a conclusion with which I agree.

I write to emphasize that fifty years of experience taught a lesson that was not ignored by the framers of the Wisconsin Constitution: that government was not the only entity that can substantially infringe on individual liberties. Accumulations of economic power by nongovernmental entities can, by the use of that power, pose as great a threat to individual liberty as can government. Their concern with the power of

542

banks, corporations, and railroads is amply document-ed in historical treatises, *see* Robert C. Nesbit, *Wisconsin A History,* (1973), Alice E. Smith, *History of Wisconsin* Vol. 1 (1973), accounts of the convention debates, *see* Brown, *The Making of the Wisconsin Constitution, Part 1,* 1949 Wis. L. Rev. 648, Brown, *The Making of the Wisconsin Constitution, Part II,* 1952 Wis. L. Rev. 23; Quaife, *supra* at 365, and the document itself. Wisconsin Const. art. I, sec. 12; art. I, sec. 17, art. XI, sec. 1; art. XI, sec. 4 (Repealed 1902); art. XIII, sec. 11.

I am authorized to state that CHIEF JUSTICE NATHAN HEFFERNAN joins in this dissent.